**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN DOE #1, an individual; JOHN
DOE #2, an individual; PROTECT
MARRIAGE WASHINGTON,
    *Plaintiffs-Appellees,*

    v.

SAM REED, in his official capacity
as Secretary of State of
Washington; BRENDA GALARZA, in
her official capacity as Public
records Officer for the Secretary of
State of Washington,
    *Defendants-Appellants.*

No. 09-35818

DC No.
CV 09-5456 BHS

JOHN DOE #1, an individual; JOHN
DOE #2, an individual; PROTECT
MARRIAGE WASHINGTON,
    *Plaintiffs-Appellees,*

    v.

SAM REED, in his official capacity
as Secretary of State of
Washington; BRENDA GALARZA, in
her official capacity as Public
records Officer for the Secretary of
State of Washington,
    *Defendants,*

    and

No. 09-35826

DC No.
CV 09-5456 BHS

14587

WASHINGTON COALITION FOR OPEN
GOVERNMENT,
    *Defendant-intervenor-Appellant.*

JOHN DOE #1, an individual; JOHN
DOE #2, an individual; PROTECT
MARRIAGE WASHINGTON,
        *Plaintiffs-Appellees,*

v.

WASHINGTON FAMILIES STANDING
TOGETHER,
    *Intervenor-Appellant,*

SAM REED, in his official capacity
as Secretary of State of
Washington; BRENDA GALARZA, in
her official capacity as Public
records Officer for the Secretary of
State of Washington,
        *Defendants.*

No. 09-35863

DC No.
CV 09-5456 BHS

OPINION

Appeals from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
October 14, 2009—Pasadena, California

Filed October 22, 2009

Before: Harry Pregerson, A. Wallace Tashima, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Tashima

## COUNSEL

James Bopp, Jr., Bopp, Coleson & Bostrom, Terre Haute, Indiana, for the plaintiffs-appellees.

William B. Collins, Deputy Solicitor General, Robert M. McKenna, Attorney General of Washington, Olympia, Washington, for the defendants-appellants.

Leslie R. Weatherhead, Witherspoon, Kelley, Davenport & Toole, Spokane, Washington, for intervenor-appellant Washington Coalition for Open Government.

Amanda J. Beane, Perkins Coie, Seattle, Washington, for intervenor-appellant Washington Families Standing Together.

## OPINION

TASHIMA, Circuit Judge:

Washington's Secretary of State and Public Records Officer (together, the "State") and Intervenors, Washington Coalition for Open Government ("WCOG") and Washington Families Standing Together ("WFST"), appeal a decision of the district court granting Plaintiffs, Protect Marriage Washington ("PMW") and two individual signers of the Referendum 71 petition, a preliminary injunction prohibiting the State from making referendum petitions available in response to requests made under Washington's Public Records Act (the "PRA"). Wash. Rev. Code § 42.56.001 *et seq.*

Under the Washington Constitution, a referendum must be ordered on a bill passed by the legislature if a specified percentage of voters sign a petition for a referendum. The Referendum 71 petition calls for a statewide election on Engrossed Second Substitute Senate Bill 5688 ("SB 5688"), which

would expand the rights and responsibilities accorded state-registered domestic partners. The PRA makes public records, including referendum petitions, available for public inspection. In seeking a preliminary injunction, Plaintiffs argued that, as applied to referendum petitions, the PRA violates the First Amendment. We have jurisdiction over this appeal from the district court's grant of a preliminary injunction under 28 U.S.C. § 1292(a)(1). We reverse.

## BACKGROUND

### I.   Washington's Public Records Act

The PRA requires state agencies to make public records available for public inspection and copying. Wash. Rev. Code § 42.56.070. It provides that "[i]n the event of conflict between the provisions of [the PRA] and any other act, the provisions of [the PRA] shall govern." Wash. Rev. Code § 42.56.030. Although the PRA contains some exemptions, none applies to referendum petitions. The PRA was enacted through the initiative process and includes its own rule of construction:

> The people insist on remaining informed so that they may maintain control over the instruments that they have created. This chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy and to assure that the public interest will be fully protected.

Wash. Rev. Code § 42.56.030.

### II.   Washington's Referendum Process

Under the Washington Constitution, although legislative authority is vested in the state legislature, the people reserve to themselves the power to reject any bill or law through the

referendum process. Wash. Const., art. II, §§ 1 & 1(b).[1] To initiate the referendum process, petitions must be filed with the Secretary of State containing the valid signatures of Washington registered voters in a number equal to four percent of the votes cast for the Office of Governor in the immediately preceding gubernatorial election. Wash. Rev. Code § 29A.72.150. Referendum petition sheets must include a place for each signer to sign and print his or her name, address, city, and county at which he or she is registered to vote. Wash. Rev. Code § 29A.72.130.

Once the referendum petition is filed, the Secretary of State must verify and canvass the names of the voters who signed the petition. Wash. Rev. Code § 29A.72.230. The verification and canvassing "may be observed by persons representing the advocates and opponents of the proposed measure so long as they make no record of the names, addresses, or other information on the petitions or related records during the verification process except upon the order of the superior court of Thurston county." *Id.* The Secretary of State may limit the number of observers to two opponents and two proponents of the referendum if the Secretary of State deems that "a greater number would cause undue delay or disruption of the verification process." *Id.*

After verification and canvassing, the Secretary of State issues a determination of whether the referendum petition contains the requisite number of valid signatures. Any citizen dissatisfied with that determination may apply to the Thurston County Superior Court for a citation requiring the Secretary of State to submit the petition to the superior court "for examination, and for a writ of mandate compelling the certification of the measure and petition, or for an injunction to prevent the certification thereof to the legislature, as the case may be." Wash. Rev. Code § 29A.72.240. Within five days of the supe-

---

[1]The Washington Constitution includes some exceptions to this reserved power, but none applies in this case.

rior court's decision, a party may seek review by the Washington Supreme Court. *Id.*

If it is ultimately determined that a petition contains the requisite number of valid signatures, the referendum is submitted to a vote at the next general election. Wash. Const., art. II, § 1(d).

## III.   Referendum 71

The Washington Governor signed SB 5688 on May 18, 2009. Known as the "everything but marriage act," the bill expands the rights and responsibilities of state-registered domestic partners. On or about May 4, 2009, Larry Stickney, the campaign manager for PMW,[2] filed notice with the Secretary of State of his intent to circulate a referendum petition on SB 5688. On July 25, 2009, PMW submitted the petition with more than 138,500 signatures to the Secretary of State for verification and canvassing.[3]

The petition, entitled "Preserve Marriage, Protect Children," includes a table for the following information for each signer: printed name, signature, home address, city and county, and an optional email address. The petition also states:

> To the Honorable Sam Reed, Secretary of State of the State of Washington:
>
> We, the undersigned citizens and legal voters of the

---

[2]PMW was organized as a state political committee pursuant to Wash. Rev. Code § 42.17.040. Its purposes are to collect the requisite number of signatures to place Referendum 71 on the ballot and to encourage Washington voters to reject SB 5688.

[3]The State asserts that about 122,000 signatures were valid. Presumably, the PRA would make available all 138,500 signatures, however, because all petition sheets, not only valid signatures, comprise the public records.

State of Washington, respectfully order and direct that Referendum No. 71 . . . shall be referred to the people of the state for their approval or rejection at the regular election to be held on the 3rd day of November, 2009; and each of us for himself or herself says: I have personally received this petition, I am a legal voter for the State of Washington, in the city (or town) and county written after my name, my residence address is correctly stated, and I have knowingly signed this petition only once.

Pursuant to Wash. Rev. Code § 29A.72.140, the petition warns that "[e]very person who signs this petition with any other than his or her true name, knowingly signs more than one of these petitions, signs the petition when he or she is not a legal voter, or makes any false statement on this petition may be punished by fine or imprisonment or both."

As of August 20, 2009, the Secretary of State had received public record requests for the Referendum 71 petition from Brian Murphy of WhoSigned.org, Toby Nixon of WCOG, Arthur West, Brian Spencer on behalf of Desire Enterprises, and Anne Levinson on behalf of WFST. Two entities, KnowThyNeighbor.org and WhoSigned.org, publicly stated that they intend to publish the names of petition signers on the internet. Plaintiffs allege that these two groups have encouraged individuals to contact petition signers to have "personal" and "uncomfortable" conversations.[4]

---

[4]Plaintiffs appear to be referring to a June 8, 2009, press release:

"What does happen," says [Aaron Toleos, co-director of KnowThyNeighbor.org], "is that conversations are triggered between people that already have a personal connection like friends, relatives, and neighbors."

"These conversations can be uncomfortable for both parties," he said, "but they are desperately needed to break down stereotypes and to help both sides realize how much they actually have in common."

## IV.  Procedural History

On July 28, 2009, Plaintiffs filed this action, seeking to enjoin the State from publicly releasing documents showing the names and contact information of the individuals who signed petitions in support of Referendum 71. Count I of the complaint alleges that, as applied to referendum petitions, the PRA violates the First Amendment because the PRA is not narrowly tailored to serve a compelling government interest. Count II alleges that, as applied to the Referendum 71 petition, the PRA is unconstitutional because "there is a reasonable probability that the signatories . . . will be subjected to threats, harassment, and reprisals."

The district court granted Plaintiffs a temporary restraining order on July 29, 2009, and, after a hearing, granted Plaintiffs' motion for a preliminary injunction on September 10, 2009, enjoining release of the Referendum 71 petition.[5] The district court applied strict scrutiny to the PRA and concluded that Plaintiffs established they were likely to succeed on Count I of their complaint.[6] The State and Intervenors timely appealed.

On September 14, 2009, the State moved this court for an emergency stay and to expedite its appeal. We consolidated the State's appeal with those of Intervenors WCOG and WFST. Because the election on Referendum 71 is set for November 3, 2009, we ordered expedited briefing on the consolidated appeals and heard oral argument on October 14, 2009, on the merits of the appeals, as well as on the stay motion.[7]

---

[5]On September 3, 2009, the district court granted the motions to intervene of WFST and WCOG.

[6]The district court based its preliminary injunction only on Count I. Because the district court did not reach the merits of Count II, we likewise do not reach Count II in reviewing the injunction.

[7]We appreciate all counsel's efforts and cooperation in meeting a highly-expedited briefing schedule.

On October 15, 2009, we granted a stay pending our disposition on the merits of these appeals.[8] We now reverse the preliminary injunction.

## STANDARD OF REVIEW

As recently articulated by the Supreme Court, a "plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008).

We review the district court's grant of a preliminary injunction for abuse of discretion. *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007)). A district court abuses its discretion if it bases its decision on an erroneous legal standard or clearly erroneous findings of fact. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Am. Trucking*, 559 F.3d at 1052). Thus, application of an incorrect legal standard in granting preliminary injunctive relief or with regard to an underlying issue is grounds for reversal. *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003) (citation omitted).

## ANALYSIS

We are presented with the novel questions of whether referendum petition signatures are protected speech under the First Amendment and, if so, what level of scrutiny applies to gov-

---

[8]On October 19, 2009, the Circuit Justice stayed our stay order. *Doe #1 v. Reed*, No. 09A356 (U.S. Oct. 19, 2009) (Kennedy, Circuit Justice). The application was thereafter referred to the full Court which confirmed the stay. *Id.* (Oct. 20, 2009). Nothing in either of those orders affects our consideration of the merits of these appeals.

ernment action that burdens such speech. For the purposes of our analysis, we assume, as did the district court, that the act of signing a referendum petition is speech, such that the First Amendment is implicated.[9] *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978) (noting that when a litigant challenges a statute on First Amendment grounds, the threshold question is whether the statute burdens expression the First Amendment protects). Even assuming that speech is involved, however, we conclude that the district court applied an erroneous legal standard when it subjected the PRA to strict scrutiny.

## I.   District court's analysis

**[1]** The district court's analysis was based on the faulty premise that the PRA regulates anonymous political speech. The signatures at issue, however, are not anonymous. First, the petitions are gathered in public, and there is no showing that the signature-gathering process is performed in a manner designed to protect the confidentiality of those who sign the petition. Second, each petition sheet contains spaces for 20 signatures, exposing each signature to view by up to 19 other signers and any number of potential signers. Third, any reasonable signer knows, or should know, that the petition must be submitted to the State to determine whether the referendum qualifies for the ballot, and the State makes no promise of confidentiality, either statutorily or otherwise. In fact, the PRA provides to the contrary. Fourth, Washington law specifically provides that both proponents and opponents of a refer-

---

[9]The State contends, with some force, that signing a referendum petition is not speech, but is instead, a legislative act, *i.e.*, that it is an integral part of the exercise of the legislative power reserved to the people by the Washington Constitution. *See State ex rel. Heavey v. Murphy*, 982 P.2d 611, 615 (Wash. 1999) (" 'A referendum . . . is an exercise of the reserved power of the people to legislate . . . .' " (quoting *Belas v. Kiga*, 959 P.2d 1037, 1040-41 (Wash. 1998))). Because we assume, for purposes of this case, that signing a referendum petition is speech, we do not reach this argument and intimate no view on it.

endum petition have the right to observe the State's signature verification and canvassing process. Thus, the district court's finding that the speech at issue is anonymous is clearly erroneous.[10] And, because it was based on that faulty premise, the district court's application of anonymous speech cases requiring strict scrutiny was error.

[2] To the extent the district court did not rely exclusively on anonymous speech cases, the district court nonetheless erred in applying strict scrutiny. Relying on *Meyer v. Grant*, 486 U.S. 414, 420-21 (1988), and *Buckley v. Am. Constitutional Law Found. (Buckley II)*, 525 U.S. 182, 197 (1999), the district court concluded that petition signing, like petition circulation, is protected political speech, and suggested that any regulation of protected political speech is subject to strict scrutiny. This suggestion is unsupported by the applicable case law. Even assuming, as we do here, that petition signing is protected political speech, it does not follow that a regulation that burdens such speech is necessarily subject to strict scrutiny. *See e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 661-62 (1994) (applying intermediate scrutiny for viewpoint- and content-neutral time, place, and manner restrictions on speech); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (applying balancing test to election restriction that burdened First Amendment rights); *Lincoln Club of Orange County v. City of Irvine*, 292 F.3d 934, 938 (9th Cir. 2002) ("[T]he level of constitutional scrutiny that we apply to a statutory restriction on political speech and associational freedom is dictated by both the intrinsic strength of, and the magnitude of the burden placed on, the speech and associational freedoms at issue.").

---

[10]This appears to be more an assumption than a finding. All that the district court "found" on this issue was that "at this time, the Court is not persuaded that waiver of one's fundamental right to anonymous political speech is a prerequisite for participation in Washington's referendum process." All of the facts underlying this finding are undisputed. We have, nonetheless, applied the deferential clear error standard of review to this finding.

## II.  Applicable level of scrutiny

Having concluded that the district court's basis for applying strict scrutiny was in error, we turn to the PRA and determine what standard should be applied.

**[3]** As noted above, not all laws that burden First Amendment rights are subject to strict scrutiny. A regulation that has an incidental effect on expressive conduct is constitutional as long as it withstands intermediate scrutiny. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968); *Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 434 (9th Cir. 2008).

In *O'Brien*, a student was arrested for burning his draft card in protest of the Vietnam War. 391 U.S. at 369-70. The student argued the statute was an unconstitutional infringement upon his right to engage in political speech. *Id.* at 370. The Supreme Court first assumed that "the alleged communicative element in O'Brien's conduct [was] sufficient to bring into play the First Amendment." *Id.* at 376. The Court then concluded that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 376. Applying intermediate scrutiny, the Court concluded that the draft card statute was not unconstitutional as applied to O'Brien. *Id.* at 377.

**[4]** As in *O'Brien*, we assume for the purposes of our analysis that signing a referendum petition has a "speech" element such that petition signing qualifies as expressive conduct. We also assume that the PRA's public access provision has an incidental effect on referendum petition signers' speech by deterring some would-be signers from signing petitions. Given these assumptions, we conclude that intermediate scrutiny applies to the PRA.[11]

---

[11]We note that "election regulations" are subject to a different analysis altogether. Instead of applying *O'Brien* intermediate scrutiny, courts apply

**[5]** Under intermediate scrutiny, as articulated in *O'Brien*, application of the PRA to referendum petitions is constitutional if the PRA is within the constitutional power of the government to enforce, it furthers an important government interest unrelated to the suppression of free expression, and the incidental restriction on alleged First Amendment freedoms is no greater than necessary to justify the interest. *O'Brien*, 391 U.S. at 377; *see also Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294 (1984).

---

a balancing test to determine whether an election regulation is a permissible infringement on First Amendment free speech rights. *See Caruso v. Yamhill County ex rel. County Comm'r*, 422 F.3d 848, 859 (9th Cir. 2005) (when an election regulation imposes only "reasonable, nondiscriminatory" restrictions upon First and Fourteenth Amendment rights, "the [s]tate's important regulatory interests are generally sufficient" to justify the restrictions) (quoting *Burdick*, 504 U.S. at 434); *see also Burdick*, 504 U.S. at 434 (holding that only when the regulation subjects such rights to severe restrictions must it be narrowly drawn to advance a compelling state interest). We assume, however, that the PRA is not an election regulation. No case offers a sound definition of an election regulation, and its meaning is not entirely discernible. However, Justice Thomas, in his *Buckley II* concurrence, provides examples of cases that would likely be election regulation cases, *see* 525 U.S. at 207, and none of them seems to parallel the current case. For example, Justice Thomas cites *Burson v. Freeman*, 504 U.S. 191, 198 (1992), wherein the Court subjected to strict scrutiny a Tennessee law prohibiting solicitation of voters and distribution of campaign literature within 100 feet of the entrance of a polling place. *Id.* He also cited *Anderson v. Celebrezze*, 460 U.S. 780, 788-90 (1983), which dealt with a challenge to an Ohio regulation that imposed a filing deadline for independent candidates. *Id.* He cited several other cases. *See e.g. Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Brown v. Hartlage*, 456 U.S. 45, 53-54 (1982); *Meyer*, 486 U.S. at 421. *Id.* at 206-07. All of these cases, however, dealt with regulations that were content-based; they all dealt directly and specifically with the election process. The PRA, on the other hand, only incidentally deals with the election process and only has attenuated consequences. It does not prevent the petition signers from signing the petitions or from otherwise lawfully qualifying their referendum for a vote. At most, it *might* deter *some* voters from signing the petition.

## III. Constitutionality of the PRA

Applying *O'Brien*, we begin by noting that Plaintiffs do not contend that "aside from its impact on speech, [the PRA] is beyond the constitutional power of the [State] to enforce." *See Clark*, 468 U.S. at 298-99. We thus turn next to the government interests the PRA furthers. The State has asserted two interests: (1) preserving the integrity of the election by promoting government transparency and accountability; and (2) providing Washington voters with information about who supports placing a referendum on the ballot. Both interests plainly qualify as important.[12]

[6] "A [s]tate indisputably has a compelling interest in preserving the integrity of the election process." *Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) (citing *Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973)); *see also Buckley II*, 525 U.S. at 191 ("States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process . . . ."). In Washington, the PRA plays a key role in preserving the integrity of the referendum process by serving a government accountability and transparency function not sufficiently served by the statutory scheme governing the referendum process. The oversight procedure provided by statute allows the Secretary of State to limit observers to two opponents and two proponents of the referendum. *See* Wash. Rev. Code § 29A.72.230. This procedure is insufficient to shift oversight from the special interest groups to the general public. *See Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 884 P.2d 592, 597 (Wash. 1994) ("Without tools such as the [PRA], government of the people, by the people, for the people, risks becoming government of the people by the bureaucrats, for the special interests.").

---

[12]In making its strict scrutiny analysis, the district court recognized only one of these interests, "preserving the integrity of its election process," as a "compelling governmental interest." It did not address the State's interest, furthered by the PRA, of an informed electorate.

Without the PRA, the public is effectively deprived of the opportunity independently to examine whether the State properly determined that a referendum qualified, or did not qualify, for the general election.

Moreover, the PRA is necessary for citizens to make meaningful use of the state superior court challenge also provided by statute. *See* Wash. Rev. Code § 29A.72.240.[13] The superior court procedure would be at best inefficient and at worst useless, if citizens have no rational basis on which to decide whether they are "dissatisfied" with the Secretary of State's determination before filing a challenge — and they cannot gain that understanding without the right to inspect the petition sheets.

We have also recognized the State's "informational interest" as important. *See Cal. Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1179 nn.8-9 (9th Cir. 2007) (noting that the informational interest was "well-established" and that California presented persuasive evidence demonstrating that it was compelling); *Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1032 (9th Cir. 2009) (having "little trouble" concluding that the state's informational interest was important).

Plaintiffs correctly note that *Cal. Pro-Life* and *Canyon Ferry* dealt with the interest in disclosure of financial backers

---

[13]That statute provides:

> Any citizen dissatisfied with the determination of the secretary of state that . . . [a] referendum petition contains or does not contain the requisite number of signatures of legal voters may, within five days after such determination, apply to the superior court of Thurston county for a citation requiring the secretary of state to submit the petition to said court for examination, and for a writ of mandate compelling the certification of the . . . petition, or for an injunction to prevent the certification thereof . . . .

Wash. Rev. Code § 29A.72.240.

of referenda, not "generally what groups may be in favor of, or opposed to, a particular . . . ballot issue." *Canyon Ferry*, 556 F.3d at 1032-33 (holding that requiring disclosure of *de minimus* in-kind contributions was unconstitutional because the marginal informational gain did not justify the burden of disclosure). Referendum petition signers, however, cannot be considered "generally" in favor of a particular ballot issue. Referendum petition signers have not merely taken a general stance on a political issue; they have taken action that has direct legislative effect. The interest in knowing who has taken such action is undoubtedly greater than knowing generally what groups are in favor of or opposed to a ballot issue.

**[7]** We conclude that each of the State's asserted interests is sufficiently important to justify the PRA's incidental limitations on referendum petition signers' First Amendment freedoms. *See O'Brien*, 391 U.S. at 376-77. We conclude also that the incidental effect of the PRA on speech is no greater than necessary. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (holding that a restriction need not be the least restrictive means of furthering the State's interest to survive intermediate scrutiny).

**[8]** Finally, no one has claimed that the State's interests are at all related to the suppression or regulation of expression. The stated aim of the PRA, which itself was passed through the initiative process, is to keep the citizens "informed so that they may maintain control over the instruments that they have created." Wash. Rev. Code § 42.56.030. There is no indication that despite this clear statement, the PRA was nonetheless intended to suppress free expression.

**[9]** Accordingly, we hold that the PRA as applied to referendum petitions does not violate the First Amendment.[14]

---

[14]Because we conclude that Plaintiffs have failed to satisfy the first *Winters* factor — likelihood of success on the merits — we need not examine the three remaining *Winters* factors, *see supra* at 14597 (quoting

## CONCLUSION

The district court applied an erroneous legal standard when it applied strict scrutiny to the PRA. The proper analysis was to apply intermediate scrutiny. Applying this analysis, we conclude that the PRA is constitutional as applied to referendum petitions.

The district court's grant of the preliminary injunction is

**REVERSED**.

---

the four-factor *Winters* test), although we note that the district court's analysis of the remaining *Winters* factors relied on presumptions, rather than findings of fact, arising from its erroneous legal conclusion that Plaintiffs' First Amendment rights were likely violated.