*190 Chief Justice Roberts
delivered the opinion of the Court.
The State of Washington allows its citizens to challenge state laws by referendum. Roughly four percent of Washington voters must sign a petition to place such a referendum on the ballot. That petition, which by law must include the *191 names and addresses of the signers, is then submitted to the government for verification and canvassing, to ensure that only lawful signatures are counted. The Washington Public Records Act (PRA) authorizes private parties to obtain copies of government documents, and the State construes the PRA to cover submitted referendum petitions.
This case arises out of a state law extending certain benefits to same-sex couples, and a corresponding referendum petition to put that law to a popular vote. Respondent intervenors invoked the PRA to obtain copies of the petition, with the names and addresses of the signers. Certain petition signers and the petition sponsor objected, arguing that such public disclosure would violate their rights under the First Amendment.
The course of this litigation, however, has framed the legal question before us more broadly. The issue at this stage of the case is not whether disclosure of this particular petition would violate the First Amendment, but whether disclosure of referendum petitions in general would do so. We conclude that such disclosure does not as a general matter violate the First Amendment, and we therefore affirm the judgment of the Court of Appeals. We leave it to the lower courts to consider in the first instance the signers’ more focused claim concerning disclosure of the information on this particular petition, which is pending before the District Court.
I
The Washington Constitution reserves to the people the power to reject any bill, with a few limited exceptions not relevant here, through the referendum process. Wash. Const., Art. II, § 1(b). To initiate a referendum, proponents must file a petition with the secretary of state that contains valid signatures of registered Washington voters equal to or exceeding four percent of the votes cast for the office of Governor at the last gubernatorial election. §§ 1(b), (d). A valid submission requires not only a signature, but also the *192 signer’s address and the county in which he is registered to vote. Wash. Rev. Code §29A.72.130 (2008).
In May 2009, Washington Governor Christine Gregoire signed into law Senate Bill 5688, which “expanded] the rights and responsibilities” of state-registered domestic partners, including same-sex domestic partners. 586 F. 3d 671, 675 (CA9 2009). That same month, Protect Marriage Washington, one of the petitioners here, was organized as a “State Political Committee” for the purpose of collecting the petition signatures necessary to place a referendum on the ballot, which would give the voters themselves an opportunity to vote on SB 5688. App. 8-9. If the referendum made it onto the ballot, Protect Marriage Washington planned to encourage voters to reject SB 5688. Id., at 7, 9.
On July 25, 2009, Protect Marriage Washington submitted to the secretary of state a petition containing over 137,000 signatures. See 586 F. 3d, at 675; Brief for Respondent Washington Families Standing Together 6. The secretary of state then began the verification and canvassing process, as required by Washington law, to ensure that only legal signatures were counted. Wash. Rev. Code §29A.72.230. Some 120,000 valid signatures were required to place the referendum on the ballot. Sam Reed, Washington Secretary of State, Certification of Referendum 71 (Sept. 2, 2009). The secretary of state determined that the petition contained a sufficient number of valid signatures, and the referendum (R-71) appeared on the November 2009 ballot. The voters approved SB 5688 by a margin of 53 percent to 47 percent.
The PRA, Wash. Rev. Code § 42.56.001 et seq. (2008), makes all “public records” available for public inspection and copying. §42.56.070(1). The Act defines “[pjublic record” as “any writing containing information relating to the conduct of government or the performance of any- governmental or proprietary function prepared, owned, used, or retained by any state or local agency.” §42.56.010(2). Washington *193 takes the position that referendum petitions are “public records.” Brief for Respondent Reed 5.
By August 20, 2009, the secretary had received requests for copies of the R-71 petition from an individual and four entities, including Washington Coalition for Open Government (WCOG) and Washington Families Standing Together (WFST), two of the respondents here. 586 F. 3d, at 675. Two entities, WhoSigned.org and KnowThyNeighbor.org, issued a joint press release stating their intention.to post the names of the R-71 petition signers online, in a searchable format. See App. 11; 586 F. 3d, at 675.
The referendum petition sponsor and certain signers filed a complaint and a motion for a preliminary injunction in the United States District Court for the Western District of Washington, seeking to enjoin the secretary of state from publicly releasing any documents that would reveal the names and contact information of the R-71 petition signers. App. 4. Count I of the complaint alleges that “[t]he Public Records Act is unconstitutional as applied to referendum petitions.” Id., at 16. Count II of the complaint alleges that “the Public Records Act is unconstitutional as applied to the Referendum 71 petition because there is a reasonable probability that the signatories of the Referendum 71 petition will be subjected to threats, harassment, and reprisals.” Id., at 17. Determining that the PRA burdened core political speech, the District Court held that plaintiffs were likely to succeed on the merits of Count I and granted them a preliminary injunction on that count, enjoining release of the information on the petition. 661 F. Supp. 2d 1194, 1205-1206 (WD Wash. 2009).
The United States Court of Appeals for the Ninth Circuit reversed. Reviewing only Count I of the complaint, the Court of Appeals held that plaintiffs were unlikely to succeed on their claim that the PRA is unconstitutional as applied to referendum petitions generally. It therefore reversed the District Court’s grant of the preliminary injunction. 586 F. 3d, at 681. We granted certiorari. 558 U. S. 1142 (2010).
*194 II
It is important at the outset to define the scope of the challenge before us. As noted, Count I of the complaint contends that the PRA “violates the First Amendment as applied to referendum petitions.” App. 16. Count II asserts that the PRA “is unconstitutional as applied to the Referendum 71 petition.” Id., at 17. The District Court decision was based solely on Count I; the Court of Appeals decision reversing the District Court was similarly limited. 586 F. 3d, at 676, n. 6. Neither court addressed Count II.
The parties disagree about whether Count I is properly viewed as a facial or as-applied challenge. Compare Reply Brief for Petitioners 8 (“Count I expressly made an as-applied challenge”) with Brief for Respondent Reed 1 (“This is a facial challenge to Washington’s Public Records Act”). It obviously has characteristics of both: The claim is “as applied” in the sense that it does not seek to strike the PRA in all its applications, but only to the extent it covers referendum petitions. The claim is “facial” in that it is not limited to plaintiffs’ particular case, but challenges application of the law more broadly to all referendum petitions.
The label is not what matters. The important point is that plaintiffs’ claim and the relief that would follow — an injunction barring the secretary of state “from making referendum petitions available to the public,” App. 16 (Complaint Count I) — reach beyond the particular circumstances of these plaintiffs. They must therefore satisfy our standards for a facial challenge to the extent of that reach. See United States v. Stevens, 559 U. S. 460, 472-473 (2010).
III
A
The compelled disclosure of signatory information on referendum petitions is subject to review under the First Amendment. An individual expresses a view on a political matter when he signs a petition under Washington’s referen *195 dum procedure. In most cases, the individual’s signature will express the view that the law subject to the petition should be overturned. Even if the signer is agnostic as to the merits of the underlying law, his signature still expresses the political view that the question should be considered “by the whole electorate.” Meyer v. Grant, 486 U. S. 414, 421 (1988). In either case, the expression of a political view implicates a First Amendment right. The State, having “cho[sen] to tap the energy and the legitimizing power of the democratic process,. . . must accord the participants in that process the First Amendment rights that attach to their roles.” Republican Party of Minn. v. White, 536 U. S. 765, 788 (2002) (internal quotation marks and ellipsis omitted).
Respondents counter that signing a petition is a legally operative legislative act and therefore “does not involve any significant expressive element.” Brief for Respondent Reed 31. It is true that signing a referendum petition may ultimately have the legal consequence of requiring the secretary of state to place the referendum on the ballot. But we do not see how adding such legal effect to an expressive activity somehow deprives that activity of its expressive component, taking it outside the scope of the First Amendment. Respondents themselves implicitly recognize that the signature expresses a particular viewpoint, arguing that one purpose served by disclosure is to allow the public to engage signers in a debate on the merits of the underlying law. See, e. g., id., at 45; Brief for Respondent WCOG 49; Brief for Respondent WFST 58.
Petition signing remains expressive even when it has legal effect in the electoral process. But that is not to say that the electoral context is irrelevant to the nature of our First Amendment review. We allow States significant flexibility in implementing their own voting systems. See Burdick v. Takushi, 504 U. S. 428, 433-434 (1992). To the extent a regulation concerns the legal effect of a particular activity in that process, the government will be afforded substantial lat *196 itude to enforce that regulation. Also pertinent to our analysis is the fact that the PRA is not a prohibition on speech, but instead a disclosure requirement. “[Disclosure requirements may burden the ability to speak, but they . . . do not prevent anyone from speaking.” Citizens United v. Federal Election Comm’n, 558 U. S. 310, 366 (2010) (intern
We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed “exacting scrutiny.” See, e. g., Buckley v. Valeo, 424 U. S. 1, 64 (1976) (per curiam) (“Since NAACP v. Alabama [ex rel. Patterson, 357 U. S. 449 (1958),] we have required that the subordinating interests of the State [offered to justify compelled disclosure] survive exacting scrutiny”); Citizens United, supra, at 366 (“The Court has subjected [disclosure] requirements to ‘exacting scrutiny’” (quoting Buckley, supra, at 64)); Davis v. Federal Election Comm’n, 554 U. S. 724, 744 (2008) (governmental interest in disclosure “‘must survive exacting scrutiny’” (quoting Buckley, supra, at 64)); Buckley v. American Constitutional Law Foundation, Inc., 525 U. S. 182, 204 (1999) (ACLF) (finding that disclosure rules “fail[ed] exacting scrutiny” (internal quotation marks omitted)).
That standard “requires a ‘substantial relation’ between the disclosure requirement and a ‘sufficiently important’ governmental interest.” Citizens United, supra, at 366-367 (quoting Buckley, supra, at 64, 66). To withstand this scrutiny, “the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.” Davis, supra, at 744 (citing Buckley, supra, at 68, 71).[1]
*197 B
Respondents assert two interests to justify the burdens of compelled disclosure under the PRA on First Amendment rights: (1) preserving the integrity of the electoral process by combating fraud, detecting invalid signatures, and fostering government transparency and accountability; and (2) providing information to the electorate about who supports the petition. See, e. g., Brief for Respondent Reed 39-42, 44-45. Because we determine that the State’s interest in preserving the integrity of the electoral process suffices to defeat the argument that the PRA is unconstitutional with respect to referendum petitions in general, we need not, and do not, address the State’s “informational” interest.
The State’s interest in preserving the integrity of the electoral process is undoubtedly important. “States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally.” ACLF, supra, at 191. The State’s interest is particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well: It “drives honest citizens out of the democratic process and breeds distrust of our government.” Purcell v. Gonzalez, 549 U. S. 1, 4 (2006) (per curiam)-, see also Crawford v. Marion County Election Bd., 553 U. S. 181, 196 (2008) (opinion of Stevens, J.). The threat of fraud in this context is *198 not merely hypothetical; respondents and their amici cite a number of cases of petition-related fraud across the country to support the point. See Brief for Respondent Reed 43; Brief for State of Ohio et al. as Amici Curiae 22-24.
But the State’s interest in preserving electoral integrity is not limited to combating fraud. That interest extends to efforts to ferret out invalid signatures caused not by fraud but by simple mistake, such as duplicate signatures or signatures of individuals who are not registered to vote in the State. See Brief for Respondent Reed 42. That interest also extends more generally to promoting transparency and accountability in the electoral process, which the State argues is “essential to the proper functioning of a democracy.” Id., at 39.
Plaintiffs contend that the disclosure requirements of the PRA are not “sufficiently related” to the interest of protecting the integrity of the electoral process. Brief for Petitioners 51. They argue that disclosure is not necessary because the secretary of state is already charged with verifying and canvassing the names on a petition, advocates and opponents of a measure can observe that process, and any citizen can challenge the secretary’s actions in court. See Wash. Rev. Code §§29A.72.230, 29A.72.240. They also stress that existing criminal penalties reduce the danger of fraud in the petition process. See Brief for Petitioners 50; §§29A.84.210, 29A.84.230, 29A.84.250.
But the secretary’s verification and canvassing will not catch all invalid signatures: The job is large and difficult (the secretary ordinarily checks “only 3 to 5% of signatures,” Brief for Respondent WFST 54), and the secretary can make mistakes, too, see Brief for Respondent Reed 42. Public disclosure can help cure the inadequacies of the verification and canvassing process.
Disclosure also helps prevent certain types of petition fraud otherwise difficult to detect, such as outright forgery and “bait and switch” fraud, in which an individual signs the *199 petition based on a misrepresentation of the underlying issue. See Brief for Respondent WFST 9-11, 53-54; cf. Brief for Massachusetts Gay and Lesbian Political Caucus et al. as Amici Curiae 18-22 (detailing “bait and switch” fraud in a petition drive in Massachusetts). The signer is in the best position to detect these types of fraud, and public disclosure can bring the issue to the signer’s attention.
Public disclosure thus helps ensure that the only signatures counted are those that should be, and that the only referenda placed on the ballot are those that garner enough valid signatures. Public disclosure also promotes transparency and accountability in the electoral process to an extent other measures cannot. In light of the foregoing, we reject plaintiffs’ argument and conclude that public disclosure of referendum petitions in general is substantially related to the important interest of preserving the integrity of the electoral process.[2]
C
Plaintiffs’ more significant objection is that “the strength of the governmental interest” does not “reflect the seriousness of the actual burden on First Amendment rights.” Davis, 554 U. S., at 744 (citing Buckley, 424 U. S., at 68, 71); see, e. g., Brief for Petitioners 12-13, 30. According to plaintiffs, the objective of those seeking disclosure of the R-71 petition is not to prevent fraud, but to publicly identify those who had validly signed and to broadcast the signers’ political views on the subject of the petition. Plaintiffs allege, for example, that several groups plan to post the petitions in searchable form on the Internet, and then encourage other citizens to seek out the R-71 signers. See App. 11; Brief for Petitioners 8, 46-47.
*200 Plaintiffs explain that once on the Internet, the petition signers’ names.and addresses “can be combined with publicly available phone numbers and maps,” in what will effectively become a blueprint for harassment and intimidation. Id., at 46. To support their claim that they will be subject to reprisals, plaintiffs cite examples from the history of a similar proposition in California, see, e. g., id., at 2-6, 31-32, and from the experience of one of the petition sponsors in this case, see App. 9.
In related contexts, we have explained that those resisting disclosure can prevail under the First Amendment if they can show “a reasonable probability that the compelled disclosure [of personal information] will subject them to threats, harassment, or reprisals from either Government officials or private parties.” Buckley, supra, at 74; see also Citizens United, 558 U. S., at 367. The question before us, however, is not whether PRA disclosure violates the First Amendment with respect to those who signed the R-71 petition, or other particularly controversial petitions. The question instead is whether such disclosure in general violates the First Amendment rights of those who sign referendum petitions.
The problem for plaintiffs is that their argument rests almost entirely on the specific harm they say would attend disclosure of the information on the R-71 petition, or on similarly controversial ones. See, e. g., Brief for Petitioners 10, 26-29, 46, 56. But typical referendum petitions “concern tax policy, revenue, budget, or other state law issues.” Brief for Respondent WFST 36 (listing referenda); see also App. 26 (stating that in recent years the State has received PRA requests for petitions supporting initiatives concerning limiting motor vehicle charges; government regulation of private property; energy resource use by certain electric utilities; long-term care services for the elderly and persons with disabilities; and state, county, and city revenue); id., at 26-27 (stating that in the past 20 years, referendum meas *201 ures that have qualified for the ballot in the State concerned land-use regulation; unemployment insurance; charter public schools; and insurance coverage and benefits). Voters care about such issues, some quite deeply — but there is no reason to assume that any burdens imposed by disclosure of typical referendum petitions would be remotely like the burdens plaintiffs fear in this case.
Plaintiffs have offered little in response. They have provided us scant evidence or argument beyond the burdens they assert disclosure would impose on R-71 petition signers or the signers of other similarly controversial petitions. Indeed, what little plaintiffs do offer with respect to typical petitions in Washington hurts, not helps: Several other petitions in the State “have been subject to release in recent years,” plaintiffs tell us, Brief for Petitioners 50, but apparently that release has come without incident. Cf. Citizens United, supra, at 370 (“Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation”).
Faced with the State’s unrebutted arguments that only modest burdens attend the disclosure of a typical petition, we must reject plaintiffs’ broad challenge to the PR A. In doing so, we note — as we have in other election law disclosure cases — that upholding the law against a broad-based challenge does not foreclose a litigant’s success in a narrower one. See Buckley, supra, at 74 (“minor parties” may be exempt from disclosure requirements if they can show “a reasonable probability that the compelled disclosure of a party’s contributors’ names will subject them to threats, harassment, or reprisals from either Government officials or private parties”); Citizens United, supra, at 370 (disclosure “would be unconstitutional as applied to an organization if there were a reasonable probability that the group’s members would face threats, harassment, or reprisals if their names were disclosed” (citing McConnell v. Federal Election Comm’n, 540 U. S. 93, 198 (2003))). The secretary of state *202 acknowledges that plaintiffs may press the narrower challenge in Count II of their complaint in proceedings pending before the District Court. Brief for Respondent Reed 17.
* * *
We conclude that disclosure under the PRA would not violate the First Amendment with respect to referendum petitions in general and therefore affirm the judgment of the Court of Appeals.

It is so ordered.

 Justice Scalia doubts whether petition signing is entitled to any First Amendment protection at all. Post, at 219 (opinion concurring in judgment). His skepticism is based on the view that petition signing has “legal effects” in the legislative process, while other aspects of political *197 participation — with respect to which we have held there is a First Amendment interest, see supra, at 194-196 — do not. See post, at 221-222, and n. 3. That line is not as sharp as Justice Scalia would have it; he himself recognizes “the existence of a First Amendment interest in voting,” post, at 224, which of course also can have legal effect. The distinction becomes even fuzzier given that only some petition signing has legal effect, and any such legal effect attaches only well after the expressive act of signing, if the secretary determines that the petition satisfies the requirements for inclusion on the ballot. See post, at 221. Petitions that do not qualify for the ballot of course carry no legal effect.

 Justice Thomas’s contrary assessment of the relationship between the disclosure of referendum petitions generally and the State’s interests in this ease is based on his determination that strict scrutiny applies, post, at 232 (dissenting opinion), rather than the standard of review that we have concluded is appropriate, see supra, at 196.