**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELIZABETH AIDA HASKELL;
REGINALD ENTO; JEFFREY PATRICK
LYONS, JR.; AAKASH DESAI, on
behalf of themselves and others
similarly situated,
　　　　　　*Plaintiffs-Appellants,*

　　　　　v.

KAMALA D. HARRIS,* Attorney
General of California; EVA
STEINBERGER, Assistant Bureau
Chief for DNA Programs,
California Department of Justice,
　　　　　　*Defendants-Appellees.*

No. 10-15152

D.C. No.
3:09-cv-04779-CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
July 13, 2010—San Francisco, California

Submission Withdrawn
June 2, 2011

Resubmitted
November 1, 2011

Filed February 23, 2012

*Kamala D. Harris is substituted for her predecessor, Edmund G. Brown, as Attorney General of California, pursuant to Fed. R. App. P. 43(c)(2).

Before: William A. Fletcher and Milan D. Smith, Jr.,
Circuit Judges, and James Dale Todd,
Senior District Judge.**

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge William A. Fletcher

---

**The Honorable James Dale Todd, Senior District Judge for the U.S. District Court for Western Tennessee, sitting by designation.

## COUNSEL

Michael T. Risher (argued), American Civil Liberties Union Foundation of Northern California, Inc., San Francisco, Cali-

fornia, and Peter C. Meier and Eric A. Long, Paul, Hastings, Janofsky & Walker LLP, San Francisco, California, for the plaintiffs-appellants.

Daniel J. Powell, Deputy Attorney General (argued), Kamala D. Harris, Attorney General of California, James M. Humes, Chief Deputy Attorney General, Jonathan K. Renner, Senior Assistant Attorney General, Constance L. LeLouis, Supervising Deputy Attorney General, and Enid A. Camps, Deputy Attorney General, San Francisco, California, for the defendants-appellees.

Daniel J. Broderick, Federal Defender, David Porter, Assistant Federal Defender, Rachelle Barbour, Research and Writing Attorney, Sacramento, California, and John T. Philipsborn, San Francisco, California, for amici curiae Federal Defender of the Eastern and Southern Districts of California, California Attorneys for Criminal Justice, and the National Association of Criminal Defense Lawyers.

Jonathan S. Franklin, Tillman J. Breckenridge, and Mark T. Emery, Fulbright & Jaworski L.L.P., Washington, D.C., for amicus curiae DNA Saves.

Anne Marie Schubert, Albert C. Locher, Jan Scully, and W. Scott Thorpe, Sacramento, California, for amicus curiae California District Attorneys Association.

---

## OPINION

M. SMITH, Circuit Judge:

Plaintiffs-Appellants Elizabeth Aida Haskell, Reginald Ento, Jeffrey Patrick Lyons, Jr., and Aakash Desai (collectively, Plaintiffs) appeal the district court's denial of their motion for a preliminary injunction to stop the enforcement of

the 2004 Amendment, *infra*, to California's DNA and Forensic Identification Data Base and Data Bank Act of 1998 (DNA Act), Cal. Penal Code § 296(a)(2)(C), which amendment requires law enforcement officers to collect DNA samples from all adults arrested for felonies. They contend that the 2004 Amendment violates their Fourth Amendment right to be free of unreasonable searches and seizures.

We assess the constitutionality of the 2004 Amendment by considering the "totality of the circumstances," balancing the arrestees' privacy interests against the Government's need for the DNA samples. Law enforcement officials collect a DNA sample from a buccal swab of the arrestee's mouth, a *de minimis* intrusion that occurs only after a law enforcement officer determines there is probable cause to believe that the individual committed a felony. Law enforcement officers analyze only enough DNA information to identify the individual, making DNA collection substantially similar to fingerprinting, which law enforcement officials have used for decades to identify arrestees, without serious constitutional objection. Moreover, state and federal statutes impose significant criminal and civil penalties on persons who misuse DNA information. On the other side of the balance, DNA analysis is an extraordinarily effective tool for law enforcement officials to identify arrestees, solve past crimes, and exonerate innocent suspects. After weighing these factors, we conclude that the Government's compelling interests far outweigh arrestees' privacy concerns. Thus, we hold that the 2004 Amendment does not violate the Fourth Amendment, and we affirm.

## BACKGROUND

In 1998, the California legislature enacted the DNA Act, Cal. Stat. Ch. 696, § 2, which requires DNA testing of individuals convicted of certain offenses. The DNA Act is intended to aid local, state, and federal law enforcement agencies "in the expeditious and accurate detection and prosecution of individuals responsible for sex offenses and other

crimes, the exclusion of suspects who are being investigated for these crimes, and the identification of missing and unidentified persons, particularly abducted children." Cal. Penal Code § 295(c).

Law enforcement use of California's DNA database has proven remarkably effective. Since 1998, California law enforcement officials have identified more than 10,000 offenders by using their DNA. To build on the positive results achieved through the implementation of the DNA Act, in 2004, California voters approved Proposition 69, the DNA Fingerprint, Unsolved Crime and Innocence Protection Act (the 2004 Amendment), which expanded the DNA Act's testing requirement to include "any adult person arrested or charged with any felony offense . . . immediately following arrest, or during the booking . . . process or as soon as administratively practicable after arrest, but, in any case, prior to release on bail or pending trial or any physical release from confinement or custody." Cal. Penal Code §§ 296(a)(2)(C); 296.1(a)(1)(A). Proposition 69 cited the "critical and urgent need to provide law enforcement officers and agencies with the latest scientific technology available for accurately and expeditiously identifying, apprehending, arresting, and convicting criminal offenders and exonerating persons wrongly suspected or accused of crime."

The 2004 Amendment became effective on January 1, 2009. Officers usually collect the DNA sample from a buccal swab that is gently swept along an arrestee's inner cheek. An arrestee's failure to cooperate with the collection is a misdemeanor. Cal. Penal Code § 298.1(a).

Once officers collect the DNA sample, it is sent to a State laboratory, which creates a DNA profile of the arrestee. The laboratory creates a profile only for identification purposes by analyzing thirteen genetic markers known as "junk DNA," which are not linked to any known genetic traits. The laboratory uses "short tandem repeat" technology (STR), which is

the repeated sequence of base pairs at each of the thirteen markers. The variation in the number of sequences at each marker creates a unique profile that law enforcement uses for identification. "One person might have two copies of the first marker that are four and eight repeats long, copies of the second that are eleven and twenty-three copies long, copies of the third that are three and ten copies long, and so on through all thirteen markers." *United States v. Mitchell*, 652 F.3d 387,401 (3d Cir. 2011) (en banc) (quoting Henry T. Greely et al., *Family Ties: The Use of DNA Offender Databases to Catch Offenders' Kin*, 34 J.L. Med. & Ethics 248, 250 (2006)). The odds that two people share identical sequences on all thirteen markers are "one in several hundred billion." *Id.*

The State laboratory then uploads the DNA profile into the Combined DNA Index System (CODIS), a nationwide collection of federal, state, and local DNA profiles. "Beyond the STR-generated DNA profile, CODIS records contain only an identifier for the agency that provided the DNA sample, a specimen identification number, and the name of the personnel associated with the analysis." *United States v. Kincade*, 379 F.3d 813, 819 n.8 (9th Cir. 2004) (en banc) (citing H.R. Rep. No. 106-900(I), at *27 (2000)).

When an arrestee's DNA profile is uploaded into CODIS, it is compared to the DNA samples collected from crime scenes. If the database reveals a "hit," the offender DNA sample is tested again for confirmation. If the test confirms a match, CODIS informs the laboratory that submitted the crime scene sample of the identity of the matching DNA profile, and the laboratory sends that information to law enforcement.

Only law enforcement officials are permitted to access a DNA profile, and they may only use the DNA to identify criminal suspects. Cal. Penal Code §§ 295.1(a); 299.5(f). They may not use the sample to reveal other traits, such as

medical conditions. Unauthorized access or disclosure of DNA information is punishable under State law by up to a year in prison and a fine of up to $50,000. Cal. Penal Code § 299.5(i). Federal law imposes similar penalties for unauthorized use of, or access to, CODIS. *See* 42 U.S.C. § 14133(c), 14135e(c).

An arrestee who is not ultimately convicted may ask either the California Department of Justice or the trial court to order the sample destroyed and the DNA profile expunged. Cal. Penal Code § 299. The individual must await the expiration of the statute of limitations for the crime(s) for which he or she was charged before requesting expungement, unless prosecutors dismiss the charges sooner. The court may order the expungement 180 days after the arrestee's request. *Id.*

After the police determined that probable cause existed in each case, Plaintiffs were arrested for felonies in California and provided DNA samples. However, they were never convicted of the felonies for which they were charged. On October 7, 2009, Plaintiffs filed a class-action complaint against the State officials who administer the DNA collection system. The class consists of "persons who are required to provide a DNA sample pursuant to § 296(a)(2)(C) solely as a result of being arrested for a felony." Their lawsuit, filed under 42 U.S.C. § 1983, alleges that the 2004 Amendment violates their Fourth Amendment rights to be free from unreasonable searches and seizures, and their Fourteenth Amendment due process rights.[1] They then sought a preliminary injunction to enjoin California from collecting DNA samples from people who were arrested, but not convicted.

The district court provisionally certified the class. On December 23, 2009, the district court denied the preliminary injunction, concluding that, as a matter of law, Plaintiffs had

---

[1] In their appellate filings, Plaintiffs have merged their Fourteenth Amendment claim into their Fourth Amendment claim.

not demonstrated a likelihood of success on the merits because California's DNA collection requirement does not violate the Fourth Amendment. The district court also concluded that Plaintiffs did not allege irreparable harm, the balance of equities tipped in favor of the State, and injunctive relief likely would not be in the public interest. Plaintiffs timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1292(a)(1). We review the district court's factual determinations for clear error. *Klein v. City of San Clemente*, 584 F.3d 1196, 1200 (9th Cir. 2009). We review the district court's application of the preliminary injunction balancing test for abuse of discretion and the legal conclusions de novo. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009). "To determine whether the district court abused its discretion, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011) (citation and internal quotation marks omitted).

## DISCUSSION

A federal court may grant a preliminary injunction only if the plaintiff establishes four elements: (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm absent a preliminary injunction; (3) the balance of equities tips in the plaintiff's favor; and (4) injunctive relief is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). If we agree with the district court's conclusion that Plaintiffs have not satisfied their burden of establishing the first element, "we need not consider the remaining three." *DISH Network Corp.*, 653 F.3d at 777; *see also Advertise.com, Inc. v. AOL Adver., Inc.*, 616 F.3d 974, 982 (9th Cir.

2010); *Doe v. Reed*, 586 F.3d 671, 681 n.14 (9th Cir. 2009), *aff'd* 130 S. Ct. 2811 (2010).

The likelihood of Plaintiffs' success on the merits hinges on whether California's mandatory DNA collection requirement under the 2004 Amendment, as applied to felony arrestees who have not been convicted, violates the Fourth Amendment. Plaintiffs challenge the 2004 Amendment, California Penal Code § 296(a)(2)(C), both facially and as applied to them. To successfully mount a facial challenge, the Plaintiffs "must establish that no set of circumstances exists under which the [2004 Amendment] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), while their as-applied challenge only requires a demonstration that the 2004 Amendment is unconstitutional as applied to the Plaintiffs. Thus, if we find that the 2004 Amendment is constitutional as applied to the provisionally certified class, the facial challenge also fails.

## I.   Analytical framework

**[1]** The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures." U.S. Const. amend. IV (emphasis added).

**[2]** It is undisputed that a compelled DNA extraction is a "search" for Fourth Amendment purposes. *See, e.g., Kincade*, 379 F.3d at 821 n.15 ("The compulsory extraction of blood for DNA profiling unquestionably implicates the right to personal security embodied in the Fourth Amendment, and thus constitutes a 'search' within the meaning of the Constitution."). The question before us is whether California's DNA collection requirement under the 2004 Amendment is an *unreasonable* search. In line with the Constitution's plain text, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal

security.' " *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).

We apply the "totality of the circumstances" balancing test to determine whether a warrantless search is reasonable. *See Samson v. California,* 547 U.S. 843, 848 (2006) (applying totality of the circumstances test to determine whether a mandatory search as a condition of parole violates the Fourth Amendment); *United States v. Kriesel*, 508 F.3d 941, 946-47 (9th Cir. 2007) (applying totality of the circumstances test to mandatory DNA collection from convicted federal felons). Under the totality of the circumstances test, "[w]hether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848 (citation and internal quotation marks omitted).

Plaintiffs contend that we may only consider the totality of the circumstances if we first find that the 2004 Amendment satisfies a "special needs" exception to the Fourth Amendment. In *Kriesel*, we explicitly rejected the special needs test when we applied the totality of the circumstances analysis to the mandatory DNA collection requirement without first determining whether a special need existed. 508 F.3d at 946. Although *Kriesel* involved DNA collection from convicted felons, Plaintiffs cite no precedent that would require the "special needs" test for DNA collection from arrestees to assess the constitutionality of a search conducted for law enforcement purposes. Interestingly, the Supreme Court even applied the totality of the circumstances test to determine whether strip searches of pretrial detainees were constitutional. *Bell v. Wolfish*, 441 U.S. 520, 559-60 (1979); *see also Mitchell*, 652 F.3d at 403 (selecting the totality of the circumstances analysis over the special needs test to assess the constitutionality of a federal requirement that pretrial detainees provide DNA samples as a condition of release). Accordingly,

we apply only the totality of the circumstances analysis to Plaintiffs' challenge to the 2004 Amendment.

## II.   Past cases involving compelled DNA testing

**[3]** The constitutionality of California's requirement that all felony arrestees provide DNA samples is a question of first impression for us.[2] However, in four cases, we have applied the totality of the circumstances analysis and upheld mandatory DNA collection, from persons who have been convicted of felonies.

In *Rise v. Oregon*, 59 F.3d 1556 (9th Cir. 1995), we upheld a state law that required certain convicted felons to provide DNA blood samples. Applying a totality of the circumstances analysis, we concluded that the statute did not violate the

---

[2]Two recent opinions addressed the constitutionality of such requirements, but we are not bound by either.

In *United States v. Pool*, 621 F.3d 1213 (9th Cir. 2010), a three-judge panel of our court upheld a federal statute that required DNA collection as a condition of pre-trial release. The case was called en banc, thereby vacating the panel opinion. On September 19, 2011, before an en banc panel heard argument, the appeal was dismissed as moot because the defendant had pleaded guilty. Because the panel opinion was vacated, we do not rely on *Pool*'s reasoning.

The California Court of Appeal, in *People v. Buza*, 197 Cal. App. 4th 1424 (Ct. App. 2011), held that California's DNA Act's requirement for felony arrestees to provide their DNA under the 2004 Amendment violates the United States Constitution. We are not bound by *Buza* for three reasons. First, federal courts are not required to follow state courts' interpretations of federal law. *See Congoleum Corp. v. DLW Aktiengesellschaft*, 729 F.2d 1240, 1242 (9th Cir. 1984). Second, *Buza* relies primarily on Ninth Circuit dissents, not the controlling, majority opinions. Finally, the California Supreme Court granted review of *Buza* on October 19, 2011, thereby automatically depublishing *Buza*. Cal. Rules of Court 8.1105(e); 8.1115. "Although we are not precluded from considering unpublished state court opinions, we are not bound by them either." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 943 n.4 (9th Cir. 1997) (internal citation omitted).

Fourth Amendment because of "the reduced expectations of privacy held by persons convicted of one of the felonies to which [the statute] applies, the blood extractions' relatively minimal intrusion into these persons' privacy interests, the public's incontestable interest in preventing recidivism and identifying and prosecuting murderers and sexual offenders, and the likelihood that a DNA data bank will advance this interest[.]" *Id.* at 1562.

In *Kincade*, we upheld a requirement that people convicted of certain serious federal felonies provide DNA blood samples. 379 F.3d at 840. The plurality of the en banc court applied the totality of the circumstances analysis and concluded that the compelled DNA collection "can only be described as minimally invasive — both in terms of the bodily intrusion it occasions, and the information it lawfully produces." *Id.* at 838. On the other side of the balancing test, the plurality concluded that the DNA collection helps ensure that a parolee complies with requirements of release, reduces recidivism, and "helps bring closure to countless victims of crime who long have languished in the knowledge that perpetrators remain at large." *Id.* at 839.

Similarly, in *Kriesel*, we upheld an amendment to the federal DNA collection act, which requires DNA collection from all persons convicted of federal felonies. We held that, under the totality of the circumstances, the statute is constitutional "because the government's significant interests in identifying supervised releasees, preventing recidivism, and solving past crimes outweigh the diminished privacy interests that may be advanced by a convicted felon currently serving a term of supervised release." 508 F.3d at 950.

Most recently, in *Hamilton v. Brown*, 630 F.3d 889 (9th Cir. 2011), we held that California's requirement that prison inmates must provide blood samples for DNA identification comports with the Fourth Amendment.

*Rise*, *Kincade*, *Kriesel,* and *Hamilton* involved DNA searches of people who have been *convicted* of felonies. We acknowledge that convicted persons have lesser privacy expectations than persons who have only been arrested for felonies. *See United States v. Scott*, 450 F.3d 863, 873 (9th Cir. 2006) (holding that a defendant "out on his own recognizance before trial" has privacy interests "far greater than a probationer's."). However, the general principles outlined in these cases are instructive for our totality of the circumstances analysis.

### III. *Friedman v. Boucher*

Before applying the totality of the circumstances analysis to the 2004 Amendment, we must address Plaintiffs' claim that *Friedman v. Boucher*, 580 F.3d 847 (9th Cir. 2009) requires us to find, as a matter of law, that the 2004 Amendment is unconstitutional.

In *Friedman*, plaintiff Kenneth Friedman pled guilty in Montana to sexual intercourse without consent, in 1980. *Id.* at 851. He was released from prison in 2001, at which point he was not on parole or otherwise under state supervision. Montana law required Friedman to submit a DNA sample, but he never did. In March 2003, after he had moved to Las Vegas, Friedman was incarcerated as a pre-trial detainee on unrelated charges, and, at the direction of a deputy district attorney, a police detective forced Friedman to provide DNA via a buccal swab. *Id.* No Nevada statute authorized the collection of DNA, nor were there any limits on the use of the information derived from Friedman's DNA. Friedman sued under 42 U.S.C. § 1983, alleging a violation of his Fourth Amendment rights. The district court found that the defendants had qualified immunity and dismissed the case. *Id.*

We found that the Montana statute did not provide Nevada police with authority to collect Friedman's DNA sample, nor did the search constitute a "special need" that is exempt from

the Warrant Clause. *Id.* at 853-54. Although we did not explicitly apply the totality of the circumstances analysis, we briefly assessed the "reasonableness" of the Nevada officer's actions and distinguished the case from *Kincade* and *Kriesel* because Friedman was not on parole or otherwise under police supervision. *Id.* at 857-58. Accordingly, we reversed the district court, concluding:

> The warrantless, suspicionless, forcible extraction of a DNA sample from a private citizen violates the Fourth Amendment. The actions of the officers were not justified under the 'special needs' exception, reliance on an extraterritorial statute, or on general Fourth Amendment principles. The search and seizure of Friedman's DNA violated the Constitution.

*Id.* at 858.

Although *Friedman* contains very broad dicta that Plaintiffs have construed as requiring us to find that all DNA collection from felony arrestees is *per se* unconstitutional, its holding is expressly limited to the unique set of facts in that case. *See Friedman,* 580 F.3d at 851 ("Because the forcible taking of the DNA sample *under these circumstances* violated Friedman's clearly established Fourth Amendment rights, we reverse.") (emphasis added). Thus, *Friedman* requires us to find the 2004 Amendment unconstitutional only if we conclude that the circumstances of that case are sufficiently similar to the facts here. We conclude that *Friedman* differs significantly from this case for five reasons.

First, the DNA collection in *Friedman* was conducted at the whim of one deputy district attorney, acting without any statutory authority. Although the Las Vegas police attempted to collect the DNA under the Montana statute, we held that they were not allowed to do so because the Montana statute did not apply extraterritorially. *See Friedman,* 580 F.3d at 854 ("Defendants were Nevada officials searching a Nevada citi-

zen in the state of Nevada for Nevada law enforcement purposes. They are not entitled to justify their search with a Montana statute.") In contrast, the DNA collected in California from the Plaintiffs was approved in a statewide ballot referendum, which is "a basic instrument of democratic government[.]" *Eastlake v. Forest City Enters, Inc.*, 426 U.S. 668, 679 (1976); *see also Southern Alameda Spanish Speaking Org. v. City of Union City*, 424 F.2d 291, 294 (9th Cir. 1970) (describing the referendum as "an exercise by the voters of their traditional right through direct legislation to override the views of their elected representatives as to what serves the public interest."). Millions of California voters considered the reasonableness of collecting DNA from arrestees, in stark contrast to the search in *Friedman*.

Second, the police in *Friedman* singled out one individual for a search. In contrast, the California DNA Act is programmatic and applies to all felony arrestees. California police officers lack any discretion to choose which individuals are subject to DNA collection. Because officers in California cannot choose the subjects of DNA collection, there is far less potential for abuse or arbitrary action. "An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents." *Skinner v. Ry Labor Executives' Ass'n*, 489 U.S. 602, 621-22 (1989). "[S]tandardized criteria . . . or [an] established routine" can prevent a search from being "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990); *see also United States v. Weikert*, 504 F.3d 1, 14 (1st Cir. 2007) ("Courts have acknowledged that the presence of such discretion affects the balancing of interests[.]").

Third, the detective "forced Friedman's jaw open and forcefully took a buccal swab from the inside of Friedman's mouth." *Friedman*, 580 F.3d at 851. This use of force weighed heavily in our reasonableness analysis. *Id.* at 856-57.

In contrast, California arrestees typically swipe the buccal swab along their own mouths; thus law enforcement officials do not usually use force. Although the 2004 Amendment allows law enforcement officials to compel the taking of DNA samples, a supervisor must first provide written approval for the use of force, and the force must "be preceded by efforts to secure the voluntary compliance with this section." Cal. Penal Code § 298.1(c)(1)(C).

Fourth, the California DNA Act imposes criminal penalties on people who misuse DNA information, Cal. Penal Code § 299.5(i); Nevada had no such safeguards because no statute authorized the DNA collection. Friedman's DNA theoretically could have been accessed by anyone and used for any purpose, not just identification. In *Rise*, the restrictions on access to DNA information weighed in favor of finding the statute reasonable. 59 F.3d at 1561.

Finally, the California DNA Act is clearly intended to allow law enforcement officials to identify criminal suspects, a purpose that we expressly approved in *Rise. See* 59 F.3d at 1560 ("[E]veryday 'booking' procedures routinely require even the merely accused to provide fingerprint identification, regardless of whether investigation of the crime involves fingerprint evidence."). It is unclear what purpose the DNA collection in *Friedman* was intended to serve because it was not authorized by any Nevada statute or regulation. In a recent en banc opinion upholding a federal requirement for DNA collection as a condition of pretrial release, the Third Circuit declined to follow *Friedman* because it "did not consider the identification purpose of DNA samples[.]" *Mitchell*, 652 F.3d at 413 n.23. We agree with the Third Circuit's reasoning on this point.

Our dissenting colleague claims that *Friedman* "requires us to hold that Proposition 69 violates the Fourth Amendment," yet he glosses over the significant differences we cite between that case and this one. The search in *Friedman* raised far more

significant Fourth Amendment concerns than does the case before us because there was no statutory authorization for the search, authorities singled out one individual, and there were no restrictions on the access to, or use of, the DNA information. Accordingly, the "reasonableness" analysis of *Friedman* is inapposite here, its holding does not bind us, and we proceed to apply a totality of the circumstances test to the specific facts of this case.

## IV. Totality of the circumstances

In assessing the totality of the circumstances, we balance the individual's privacy interests against the Government's interests in prison administration and law enforcement. *Samson*, 547 U.S. at 848.

## A. Felony arrestees' privacy interests

The 2004 Amendment does not provide the Government *carte blanche* to take buccal swabs from anyone and everyone. It applies only to persons arrested on suspicion of having committed a felony. *Before individuals can be required to give a buccal swab DNA sample under the 2004 Amendment, a law enforcement officer must determine that there is probable cause to suspect that person of having committed a felony.*

Even critics of mandatory DNA sampling concede that a felony arrestee has a significantly diminished expectation of privacy. *See Kincade,* 379 F.3d at 864 (Reinhardt, J., dissenting) ("Arrestees' privacy interests, too, appear to be significantly reduced."). Upon arrest, individuals are often booked and placed in a jail cell pending arraignment or bail, and at that point they are typically subjected to numerous degrading physical and emotional intrusions. They may be subjected to visual body cavity searches, *Bell*, 441 U.S. at 558 & n.39 (upholding searches where male inmates "must lift [their] genitals and bend over to spread [their] buttocks for visual inspection" and "[t]he vaginal and anal cavities of female

inmates also are visually inspected"); *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 974-75 (9th Cir. 2010) (en banc) (same); be monitored by guards of the opposite sex while they shower and use the toilet, *Johnson v. Phelan*, 69 F.3d 144, 145 (7th Cir.1995); be restrained and pepper-sprayed, *Garrett v. Athens-Clarke Cnty., Ga.*, 378 F. 3d 1274, 1278 (11th Cir. 2004); have their telephone access restricted, *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048-49 (9th Cir. 2002); occasionally be housed with violent detainees who leave them "with facial injuries that require[ ] surgery, *Schoelch v. Mitchell*, 625 F.3d 1041, 1043 (8th Cir. 2010); and be "in lockdown for as much as 23½ hours a day, always shackled in chains, even when taking a shower or making a phone call, and rarely being allowed to see daylight and breathe fresh air." Jeff German, *Conditions at jail 'harsh' but court can't change them*, Las Vegas Sun (Oct. 28, 2008). The dissent suggests, without any authority for his claim, that security interests and other exigent circumstances allow these privacy intrusions, but not DNA sampling. Just as such intrusive jail-related conditions could not lawfully be imposed on ordinary citizens, neither does the 2004 Amendment impose the taking of buccal DNA swabs from ordinary citizens.[3]

We evaluate Plaintiffs' allegations that the 2004 Amendment is unreasonable against this backdrop of diminished privacy rights. We evaluate two distinct claims of privacy intrusion: the physical collection of the DNA, and the analysis of the information contained in that sample.

---

[3]Plaintiffs contend that, because approximately one-third of arrestees are never convicted, the 2004 Amendment results in the Government's maintaining a database of DNA profiles of innocent citizens. This argument ignores the fact that an arrestee who is not convicted may ask the trial court to expunge the DNA profile from the database. Cal. Penal Code § 299(b). This process effectively addresses Plaintiffs' concerns that California will build a database of DNA profiles of people who are ultimately found innocent.

### 1.   The physical intrusiveness of the search

**[4]** Nearly half a century ago, the Supreme Court upheld as "reasonable" a hospital's extraction of a blood sample, which was done "[a]t the direction of a police officer" who was investigating a person suspected of driving under the influence. *Schmerber v. California*, 384 U.S. 757, 758, 771 (1966). *See also Skinner*, 489 U.S. at 616 ("[I]t is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable.") . Like the Plaintiffs in this case, the suspect in *Schmerber* had not yet been convicted of a crime.

**[5]** The typical modern DNA collection procedure—the buccal swab—is far less invasive than the blood test approved in *Schmerber*. In the buccal swab DNA sampling, a cotton swab is briefly inserted into the person's mouth; in the typical blood extraction (such as the one addressed in *Schmerber*), a needle must be inserted into a blood vessel for a perceptible amount of time. The buccal swab cannot seriously be viewed as an unacceptable violation of a person's bodily integrity.[4] *See United States v. Amerson*, 483 F.3d 73, 84 n.11 (2d Cir. 2007) ("[A] cheek swab can be taken in seconds without any discomfort."); Jules Epstein, *"Genetic Surveillance" — The Bogeyman Response to Familial DNA Investigations*, 2009 U. Ill. J.L. TECH & POL'Y 141, 152 (2009) ("The taking of bodily material for DNA testing is perhaps the least intrusive of all seizures — it involves no penetration of the skin, pain, or substantial inconvenience."). Moreover, California law enforcement officers typically allow arrestees to perform the buccal swab collection on themselves, further minimizing the physical privacy intrusion.

---

[4]As in *Schmerber*, the parties in this case are not among "the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing. . . . We need not decide whether such wishes would have to be respected." 384 U.S. at 771.

**[6]** In short, the physical extraction of DNA using a buccal swab collection technique is little more than a minor inconvenience to felony arrestees, who have diminished expectations of privacy. Moreover, it is substantially less intrusive, both physically and emotionally, than many of the other types of approved intrusions that are routinely visited upon arrestees, see *supra* at 1967-68.

## 2. The Government's use and retention of DNA information

Plaintiffs challenge not only the physical intrusion of the buccal swab, but the collection and use of the information contained in the DNA sample.

**[7]** Although Plaintiffs use the phrase "DNA profile" to evoke images of an oppressive "Big Brother" cataloguing our most intimate traits, the reality is far less troubling. A DNA profile contains only thirteen "junk DNA" markers that are not linked to any genetic or physical trait. They are used only to identify the individual. *See* Cal. Penal Code § 295.1(a) ("The Department of Justice shall perform DNA analysis . . . pursuant to this chapter only for identification purposes."); *Kincade*, 379 F.3d at 837 ("[T]he DNA profile derived from the defendant's blood sample establishes only a record of the defendant's identity — otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of a qualifying offense (indeed, once lawfully arrested and booked into state custody)."); *Amerson*, 483 F.3d at 85 ("[A]t least in the current state of scientific knowledge, the DNA profile derived from the offender's blood sample establishes only a record of the offender's identity.").

**[8]** Given the minimal amount of information contained in a DNA profile, we are persuaded that DNA, as collected and used under the 2004 Amendment, is substantially indistinguishable from traditional fingerprinting as a means of identi-

fying arrestees and, incidentally, tying arrestees to criminal investigations. *See Rise*, 59 F.3d at 1559 ("The information derived from the blood sample is substantially the same as that derived from fingerprinting - an identifying marker unique to the individual from whom the information is derived."); *Mitchell*, 652 F.3d at 412 ("[B]ecause DNA profiles developed pursuant to the DNA Act function as 'genetic fingerprints' used only for identification purposes, arrestees and pretrial detainees have reduced privacy interests in the information derived from a DNA sample.").

Although there are some distinctions between DNA and fingerprints, these distinctions do not implicate serious *privacy* concerns. These differences include, among others: DNA identification is more robust and reliable than fingerprint identification, *see Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2316 (2009) ("Modern DNA testing can provide powerful new evidence unlike anything known before."); DNA is more often left at crime scenes than fingerprints, thus enhancing DNA's investigative efficacy; and, as emphasized by Plaintiffs, DNA contains a much broader range of identifying information than fingerprints and is more susceptible to misuse. Nevertheless, the relative reliability and greater availability of DNA do not affect any cognizable privacy interests (as individuals do not have a "privacy interest" *per se* in the efficiency of law enforcement operations), and the wider potential usage of DNA data (and accompanying potential for abuse) is carefully restricted by the strict limitations established in the DNA Act.

**[9]** Fingerprinting has been consistently upheld as constitutional. *Hayes v. Florida*, 470 U.S. 811, 813-18 (1985); *Napolitano v. United States*, 340 F.2d 313, 314 (1st Cir. 1965) ("Taking of fingerprints . . . is universally standard procedure, and no violation of constitutional rights."); *United States v. Iacullo*, 226 F.2d 788, 793 (7th Cir. 1955) ("[Defendant's] constitutional rights were not violated when his fingerprints were taken and at the trial used as a basis for comparison with

fingerprints found on newspapers used to wrap narcotics."); *United States v. Kelly*, 55 F.2d 67, 68-69 (2d Cir. 1932). Indeed, at oral argument, Plaintiffs' counsel conceded that fingerprinting does not violate the Fourth Amendment. Given the certain constitutionality of fingerprinting and the clear analogy between fingerprinting and DNA identification under the DNA Act, as amended, privacy concerns here are diminished substantially. We agree with the dissent's concession that "fingerprints and DNA are similar." We also generally have no quarrel with the dissent's statement that the Supreme Court has "held that fingerprints may not be taken unless there is consent, a warrant, or probable cause."[5]

The dissent's key argument collapses, however, because he completely ignores the fact that the California DNA Act clearly requires that law enforcement officers may only compel DNA collection upon a finding of probable cause that the individual has committed a felony. Moreover, each of the four cases on which the dissent relies for some of his remarkable theories— *Hayes; Davis v. Mississippi*, 394 U.S. 721 (1969); *United States v. Ortiz-Hernandez*, 427 F.3d 567 (9th Cir. 2005); and *United States v. Garcia-Beltran*, 389 F.3d 864 (9th Cir. 2004), involved the compelled taking of fingerprints of people who had been arrested *without probable cause*.[6] This

---

[5]However, we disagree with our colleague's dismissal as "dictum" of the Supreme Court's clear statement that "[t]here is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, [and] if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime." *Hayes*, 470 U.S. at 816-17 (1985).

[6]*See Hayes*, 470 U.S. at 813-14 ("[T]here was no probable cause to arrest, no consent to the journey to the police station, and no judicial authorization for such a detention for fingerprinting purposes."); *Davis*, 394 U.S. at 725 ("[T]he State conceded that the arrest on December 12 and the ensuing detention through December 14 were based on neither a warrant nor probable cause"); *Ortiz-Hernandez*, 427 F.3d at 575 ("[W]e cannot say that the district court clearly erred when it ruled that consider-

distinction completely undermines our dissenting colleague's novel interpretation of the Fourth Amendment, and his reliance on the four cited cases. We agree that the California DNA Act would be unconstitutional if it allowed police officers to collect DNA samples from random citizens on the street without any probable cause to believe that they committed a crime. In reality, however, the police cannot collect DNA without first determining that there is probable cause that the individual committed a felony.

The other fatal flaw in the dissent's novel construction of the Fourth Amendment is his entirely unsupported assumption that the information derived from compelled fingerprinting and DNA collection may only be used in connection with the crime for which probable cause was found. The dissent cites absolutely no authority for this unprecedented and misguided reading of the Fourth Amendment. Were he correct, our entire criminal justice system would be upended because law enforcement officers would be prevented from using basic investigative tools. For example, under our dissenting colleague's theory, the police could never be allowed to match crime scene fingerprints to databases of prints collected from past arrestees.

Like the dissent, Plaintiffs rely on slippery-slope arguments by challenging not only what California actually does with the DNA samples, but what it *could* do with the information. Their opposition rests on hypothetical scenarios in which the Government uses the DNA sample to do more than merely identify individuals. Plaintiffs suggest that the Government could test the DNA for diseases such as cystic fibrosis and

---

ing the totality of evidence upon which Detective Anderson relied when he placed Ortiz-Hernandez under formal arrest, the evidence was insufficient to establish probable cause."); *Garcia-Beltran*, 389 F.3d at 865 ("[T]he government conceded that the police did not have probable cause to arrest Garcia-Beltran").

Alzheimer's disease. This line of reasoning—framed in bleak Orwellian terms by the California Court of Appeal in *Buza*, 197 Cal. App. 4th at 1443-44—ignores the clear statutory limitations drawn by the Legislature, and *the fact that there is no evidence in the record of a single case of DNA misuse in California*. If we were addressing a legislative scheme in which the Government could freely use a person's DNA sample in any manner and for any purpose, serious privacy interests could be at stake. But we are not presented with an open-ended legislative scheme in which citizens' entire genomes are placed on file with the Government. The DNA Act, as amended by the 2004 Amendment, sharply limits the range of permissible uses of the DNA information obtained and imposes significant criminal penalties upon those who violate such limitations. *See* Cal. Penal Code §§ 295.1, 299.5(f), 299.5(i). *See, e.g., Weikert*, 504 F.3d at 13 ("[T]he [federal] DNA Act offers a substantial deterrent to such hypothetical abuse by imposing a criminal penalty for misuse of DNA samples.").

Plaintiffs argue that California's limits on access and use are ineffective because California data is shared with law enforcement agencies nationwide via CODIS. This argument also fails because federal law imposes similar penalties for unauthorized use of CODIS. *See* 42 U.S.C. § 14133(c), 14135e(c). Moreover, even if an unauthorized person were to access California's DNA database, the only information available would be junk DNA that identifies felony arrestees. And if the junk DNA could reveal other traits, misuse of that information would likewise be barred by federal law. For example, the Genetic Information Nondiscrimination Act of 2008, Pub. L. 110-233, 122 Stat. 881, prohibits health insurers and employers from discriminating against people based on their genetic information.

While it is hypothetically possible that, at some future time, rogue Government employees may record and analyze more extensive DNA information, *see Kincade*, 379 F.3d at 847

(Reinhardt, J., dissenting), or that the California Legislature might expand the permissible scope and uses of the DNA data, *see id.* at 845-46, we cannot legitimately weigh the constitutionality of the current legal regime by arguing about hypothetical and highly speculative actions that would undeniably *violate* the DNA Act, as amended by the 2004 Amendment, as now in effect. "[O]ur job is limited to resolving the constitutionality of the program before us, as it is designed and as it has been implemented," and we must "base decisions not on dramatic Hollywood fantasies . . . but on concretely particularized facts developed in the cauldron of the adversary process and reduced to an accessible record." *Kincade*, 379 F.3d at 838; *see also Mitchell*, 652 F.3d at 408 ("While we acknowledge the seriousness of [defendant's] concerns about the possible misuse and future use of DNA samples, we conclude that these hypothetical possibilities are unsupported by the record before us and thus do not have any substantial weight in our totality of the circumstances analysis."); *Weikert*, 504 F.3d at 14 (noting absence of evidence in the record showing misuse of DNA information stored in CODIS); *Amerson*, 483 F.3d at 87 (same). If and when such changes occur, future courts will be available to consider actual facts and applications, and determine whether the law, as then constituted, violates the Constitution.

[10] Setting aside Plaintiffs' parade of horribles, California's limited use of the DNA and the complete absence of any evidence of abuse lead us to conclude that the collection of information from "junk DNA" markers does not significantly intrude upon felony arrestees' privacy.

## B. The Government's interests in prison administration and law enforcement

[11] The Government has four key interests we weigh on the other side of the balance: identifying arrestees, solving past crimes, preventing future crimes, and exonerating the innocent.

### 1.  Identification of arrestees

The amended DNA Act's primary purpose is to identify arrestees. *See* Cal. Penal Code § 295.1(a) ("The Department of Justice shall perform DNA analysis . . . pursuant to this chapter only for identification purposes"). This interest is longstanding and unobjectionable. "[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest." *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992); *see also Kriesel*, 508 F.3d at 947 ("[T]racking . . . identity is the primary consequence of DNA collection").

"Identification" encompasses not merely a person's name, but also other crimes to which the individual is linked. "Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty.*, 542 U.S. 177, 186 (2004). "Whether an arrestee is possibly implicated in other crimes is critical to the determination of whether or not to order detention pending trial." *Mitchell*, 652 F.3d at 414; *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1123 (2002) (broadly defining "identity" as "the condition of being the same with something described, claimed, or asserted or of possessing a character claimed"). The collection and use of DNA for identification purposes is substantially identical to a law enforcement officer obtaining an arrestee's fingerprints to determine whether he is implicated in another crime. *See Johnson v. Quander*, 440 F.3d 489, 498 (D.C. Cir. 2006) ("[T]he process of matching one piece of personal information against government records does not implicate the Fourth Amendment.").

Plaintiffs contend that DNA profiling is unnecessary because law enforcement officers already identify arrestees using traditional fingerprinting. However, this argument ignores the significant advantages of DNA profiling over fin-

gerprinting. Criminals can easily hide their fingerprints by wearing gloves, but they cannot mask their DNA. *See Mitchell*, 652 F.3d at 414. DNA testing provides "the capacity to identify or to exclude individuals, quickly, accurately, and at reasonable expense." *Amerson*, 483 F.3d at 89. "[F]or purposes of identifying a particular person as the defendant, a DNA profile is arguably the most discrete, exclusive means of personal identification possible." *People v. Robinson*, 47 Cal. 4th 1104, 1134 (2010) (internal quotation marks omitted). Nothing in the Constitution compels us to adopt a Luddite approach that would prevent the Government from using this new and highly effective tool to replace (or supplement) older ones.

Plaintiffs also assert that the Government takes "months" to analyze DNA samples, the effect of which is to show that DNA analysis does not advance the Government's interest in identifying arrestees. This argument exaggerates the facts: on average, Government analysis of DNA takes 31 days, but some samples have been processed in as few as five days. Although only of persuasive value, Plaintiffs also ignore the high likelihood that DNA technology will improve and substantially reduce processing times. Moreover, even at current processing rates, DNA analysis can be highly effective. For example, California's Criminal Justice Realignment legislation, Assembly Bill 109, Stats. 2011, Ch. 15, which went into effect on October 1, 2011, requires the transfer of many State prisoners to county jails. To reduce overcrowding in county jails, the statute allows prisoners to be released on their own recognizance sixty days after their arrest, subject to a discretionary review by the county. Collecting DNA at the time of arrest will help the county determine whether a prisoner is linked to other crimes before deciding whether to release the prisoner. Because release cannot occur before sixty days after arrest, the 31-day average processing time will give counties adequate time to compare arrestees' DNA with current and past crime data before they are released.

## 2.  Solving past crimes

DNA's remarkable ability to accurately identify arrestees is a sufficiently compelling interest to justify the 2004 Amendment. However, the DNA database also serves other important law enforcement purposes. By accurately identifying arrestees, the DNA database also helps solve past crimes. Solving crimes is a legitimate factor in our totality of the circumstances analysis because it "helps bring closure to countless victims of crime who long have languished in the knowledge that perpetrators remain at large." *Kincade*, 379 F.3d at 839; *see also Mitchell*, 652 F.3d at 414-415 ("Collecting DNA samples from arrestees can speed both the investigation of the crime of arrest and the solution of any past crime for which there is a match in CODIS.").

Law enforcement officials already have used California's expanded database to solve numerous past crimes. As of October 31, 2009 — ten months after Proposition 69 took effect — felony arrestee DNA samples had aided California police in 291 database hits. Matches from offender DNA profiles to crime scene profiles increased by approximately 50 percent between 2008 and 2009, when Proposition 69 took effect.

For example, in March 2009, police collected Donald Carter's DNA when he was arrested in Sacramento for possession of a controlled substance. Three months later, the police, using the DNA database, linked his profile to DNA collected from a 1989 murder of an 80-year-old woman. Similarly, Rene Hernandez, who had no prior felony convictions, was arrested on August 16, 2009 for felony assault in Santa Cruz County, and his DNA was collected at that time. In October 2009, the DNA database matched his profile to DNA that was collected from the victim of a February 2009 sexual assault and robbery.

As California continues to add felony arrestees' DNA to its database, law enforcement officers will undoubtedly solve even more past crimes.

### 3. Preventing future crimes

DNA analysis not only solves past crimes, but it helps police prevent crimes from occurring in the future. By implementing the 2004 Amendment, law enforcement officials will have a catalogue of arrestees' DNA, a tool that will undoubtedly help solve and prevent future crimes.

The mere existence of the DNA database creates a strong deterrent effect. As discussed *supra*, it is much easier for a criminal to cover his fingerprints than it is to prevent any DNA from being left at a crime scene. A felony arrestee is less likely to commit another crime in the future if he knows that his DNA is catalogued in the State database. *See, e.g., Kincade*, 379 F.3d at 839 (stating that mandatory DNA profiles of convicted felons "fosters society's enormous interest in reducing recidivism"); *Jones*, 962 F.2d at 311 ("[T]he Commonwealth's interest in combatting and deterring felony recidivism justifies the involuntary taking of the sample and the creation of the DNA data bank as reasonable in the context of the Fourth Amendment.").

### 4. Exonerating innocent suspects

By helping identify the actual perpetrators of crimes, the DNA database also allows law enforcement officers to eliminate innocent persons from suspect lists. *See Kincade*, 379 F.3d at 839 n.38 (DNA fingerprinting "promptly clears thousands of potential suspects"); *United States v. Sczubelek*, 402 F.3d 175, 185 (3d Cir. 2005) ("[T]he DNA samples will help to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit and will help to eliminate individuals from suspect lists when crimes occur.").

DNA databases have proven remarkably effective in exonerating the innocent. According to the Innocence Project, there have been 273 post-conviction DNA exonerations in the United States since 1989. In 123 of the cases, the true suspects or perpetrators were also identified.

The case of David Allen Jones is a powerful illustration of the benefits of arrestee DNA sampling. Jones, a mentally disabled janitor, was wrongly convicted in 1995 for three murders in the Los Angeles area. *See* Andrew Blankstein, *et al.*, *DNA Analysis Links Inmate to 12 Slayings*, L.A. Times, Oct. 23, 2004, at A1. Jones spent nearly nine years in prison. He was released in 2004, after DNA collected at two of the murder scenes was linked to the DNA profile of Chester Dwayne Turner. Although Turner had been arrested 20 times between 1987 and 2002, his DNA sample was not collected until after he was convicted of rape in 2002. *Id.* Had the 2004 Amendment been in effect in 1995, it is likely that Jones never would have been imprisoned because police would have had access to Turner's DNA profile.

There are few greater injustices than the wrongful imprisonment of an innocent person. The privacy intrusion caused by a buccal swab of a felony arrestee is minor compared to society's compelling goal of ensuring that innocent people are exonerated.

## C.   Balancing

**[12]** Given the arrestee's diminished privacy interests; the *de minimis* nature of the physical intrusion entailed in the taking of a buccal swab; the carefully circumscribed scope of the DNA information being extracted; the stringent limits on the manner in which that information may be used; and the well-established law enforcement interest in obtaining arrestees' identifying information, and further, to deter future criminal acts and to exculpate innocent arrestees—the balance of inter-

ests tilts strongly in favor of upholding the constitutionality of the 2004 Amendment.

We emphasize that our decision deals solely with DNA extraction, processing, and analysis as it presently exists, and is enforced. We acknowledge that future developments in the law could alter the constitutionality of the DNA Act, as amended. *See Kincade*, 379 F.3d at 842 n.3 (Gould, J., concurring in the judgment). But we cannot test the amended DNA Act's *current* legality in light of uncertain *future* amendments to the law, which themselves would likely violate the DNA Act, as amended by the 2004 Amendment.

## CONCLUSION

[13] Because the 2004 Amendment does not violate the Fourth Amendment as applied to the Plaintiffs, the facial challenge also fails because Plaintiffs cannot "establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. Accordingly, we hold that the district court did not err in determining that Plaintiffs did not establish a likelihood of success on the merits, and we affirm its denial of the preliminary injunction.

**AFFIRMED.**

---

W. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent.

In *Friedman v. Boucher*, 580 F.3d 847 (9th Cir. 2009), we held that the taking of a DNA sample without a warrant, and without suspicion of a crime that the DNA sample would help solve, violated the plaintiff's clearly established Fourth Amendment rights. Proposition 69 requires that DNA samples be taken from all felony arrestees, with or without their con-

sent, upon their arrest. There is no need for a warrant, and there is no need for suspicion of a crime that the DNA sample would help solve. Our decision in *Friedman* requires us to hold that Proposition 69 violates the Fourth Amendment.

Even if *Friedman* were not on the books, I would conclude that Proposition 69 is unconstitutional. My reasoning is straightforward. Fingerprints may be taken from an arrestee in order to identify him—that is, to determine whether he is who he claims to be. But fingerprints may not be taken from an arrestee solely for an investigative purpose, absent a warrant or reasonable suspicion that the fingerprints would help solve the crime for which he was taken into custody. *Hayes v. Florida*, 470 U.S. 811, 814 -15 (1985); *Davis v. Mississippi*, 394 U.S. 721, 727 -28 (1969); *United States v. Ortiz-Hernandez*, 427 F.3d 567, 576 (9th Cir. 2005); *United States v. Garcia-Beltran,* 389 F.3d 864, 865 (9th Cir. 2004). DNA samples are not taken from felony arrestees under Proposition 69 in order to identify them. Rather, they are taken solely for an investigative purpose, without a warrant or reasonable suspicion. The taking of DNA samples from arrestees solely for that purpose is invalid under *Hayes*, *Davis*, *Ortiz-Hernandez*, and *Garcia-Beltran*.

## I.   Background

The four named plaintiffs were arrested for felonies in 2009. They were compelled under Proposition 69 to provide DNA samples immediately after their arrests. Two of the plaintiffs were never charged with crimes. The other two plaintiffs were charged with felonies, but the charges were dismissed. No warrants authorized taking any of the DNA samples. Nor was there a suspicion of any crime that the DNA samples would help solve.

Elizabeth Haskell was arrested on March 21, 2009, for allegedly trying to take a person from police custody during a San Francisco peace demonstration. She was taken to the

San Francisco County jail, where she was ordered to provide a DNA sample. She was told that she would be charged with a misdemeanor if she refused to comply immediately. She provided a sample but states she would have refused if she had not been threatened. Haskell was never charged with a crime. She states, "I now live with the fear that my DNA might be falsely matched to a sample obtained from a crime scene, even if I remain completely law abiding. As a political activist, I also recognize the taking of DNA from those arrested during political activities as an intimidation tactic, increasing the cost of voicing any freedom of expression."

Reginald Ento was arrested in early 2009 on suspicion of possessing stolen property. He was taken to the Sacramento County jail, where a sheriff's deputy collected a DNA sample without his consent. Ento states that the deputy told him that the DNA could be taken by force if necessary. He states, "Not long after my DNA sample was collected, the charges against me were dropped and I was released from custody. At no time during my contact with law enforcement officials was I ever informed that I could seek to have my DNA sample destroyed and information regarding my DNA removed from any law enforcement databases, based on the fact that the charges against me [were] dropped."

Jeffrey Lyons Jr. was arrested on March 16, 2009, for allegedly trying to take a person from police custody during a demonstration outside the Israeli consulate. He was taken to the San Francisco County jail, where he was ordered to provide a DNA sample. He complied with the order. Lyons was charged with a felony, but the charge was dismissed. He states that after the charge was dismissed, "I called the San Francisco District Attorney's office . . . to ask for help in getting my DNA sample expunged. . . . The woman at the District Attorney's office said that I would have to file a motion and that I should talk to my lawyer. I then said that because my lawyer had been paid by the court I didn't know whether I would have to pay him to do this; she said she didn't know

and suggested that I call the public defender's office and that maybe they would help me."

Aakash Desai is a graduate student at the University of California, Berkeley. He participated in a demonstration in Wheeler Hall on the Berkeley campus on November 20, 2009, protesting tuition increases as well as custodial furloughs and layoffs. Campus police arrested Desai and took him to the Berkeley city jail. Desai was told at the jail that he was being charged with felony burglary. He was told that if he refused to provide a DNA sample he would be charged with a misdemeanor and his bail would be increased. Desai then provided a DNA sample. He states, "When I went to court on the following Monday for my arraignment, I learned that no charges had been filed."

In 1998, the California legislature passed the DNA Act, which created a program of warrantless DNA testing of individuals convicted of certain violent crimes. *See* 1998 Cal. Stat. ch. 696, § 2. In November 2004, California voters passed Proposition 69. Proposition 69 requires that DNA be taken from all individuals convicted of felonies. Cal. Penal Code § 296(a)(1). It also provides, effective January 1, 2009, for expansion of the DNA program to felony arrestees. Cal. Penal Code § 296(a)(2)(A)-(C).

Plaintiffs challenge the expansion to arrestees. Approximately 300,000 individuals are arrested for felonies in California each year. About a third of them are never convicted of the felonies for which they are arrested. Many, including two of the plaintiffs, are never even charged with felonies.

The arrestee is photographed and fingerprinted during the booking process. *See* Cal. Penal Code § 7(21). The arrestee's fingerprints are used to ascertain or verify his or her identity. Police officials then use the arrestee's identity, thus ascertained or verified, to determine if he or she has already provided a DNA sample. If the arrestee has not already provided

a DNA sample, officials compel the arrestee to provide one. Arrestees are told that they will not be released from jail until they provide a DNA sample and that they can be charged with a misdemeanor for refusing to provide one. Arrestees may be told that force can be used to obtain a DNA sample. *See* Cal. Penal Code § 298.1(a)-(b).

A judicial determination of probable cause for the arrest is not required, either before arrest or before a DNA sample is taken. As a practical matter, Proposition 69 precludes a judicial determination of probable cause after the arrest, for it requires that the sample be taken "immediately following an arrest, or during the booking . . . process or as soon as administratively practicable after arrest." Cal. Penal Code § 296.1(a)(1)(A). Proposition 69 nowhere mentions the desirability, or even the possibility, of a judicial determination of probable cause prior to taking the DNA sample.

After the arrestee has been identified and the DNA sample has been collected, the sample is sent to a laboratory where it is analyzed to create a DNA profile. The analysis occurs on average approximately one month after collection of the sample. California retains the sample after the analysis. *See* Cal. Penal Code § 295.1(c).

Once the arrestee's DNA sample is analyzed, the arrestee's DNA profile is entered into the Combined DNA Index System ("CODIS"). CODIS is a system of federal, state, and local DNA databases operated by the National DNA Index System ("NDIS"). CODIS stores DNA records in a number of different indexes, including an Arrestee Index and a Convict Index. California arrestees' DNA profiles are entered into the Arrestee Index.

All fifty states and the federal government participate in CODIS. Forty-seven states and the federal government collect DNA from all convicted felony offenders. Twenty-two states and the federal government collect DNA from some or all

arrestees. Law enforcement agencies around the country can access the DNA profiles contained in CODIS.

CODIS uses 13 genetic markers—in technical terms, short tandem repeat polymorphisms ("STRPs")—to create DNA profiles. The 13 genetic markers used by CODIS " 'were purposely selected because they are not associated with any known physical or medical characteristics.' " *United States v. Kincade*, 379 F.3d 813, 818-19 (9th Cir. 2004) (en banc) (plurality) (quoting H.R. Rep. No. 106-900, pt. 1 at 36 (2000)). These markers are sometimes called "junk DNA." Dr. Robert Nussbaum, Chief of Medical Genetics at the University of California, San Francisco, Department of Medicine, states, "There is currently no evidence that specific variants at any of the 13 core CODIS STRPs are themselves associated with traits of functional or medical significance." Dr. Nussbaum states that in some cases the information associated with these STRPs "might allow one to infer functional or other medical information." It is possible that "junk DNA" may be discovered, at some future time, to be directly associated with traits of functional or medical significance. *See Kincade*, 379 F.3d at 818 n.6; *see also, e.g.*, Gina Kolata, *Reanimated 'Junk' DNA Is Found to Cause Disease*, N.Y. Times, Aug. 20, 2010 at A1.

Once entered into CODIS, a DNA profile may be compared to the hundreds of thousands of crime-scene DNA profiles already entered into CODIS. A DNA profile provides an extremely accurate means of distinguishing one individual from another and a powerful tool to link particular individuals to DNA traces left at crime scenes. *See Kincade*, 379 F.3d at 818-19 (9th Cir. 2004). A comparison between DNA profiles and crime-scene DNA samples is performed each week by CODIS. If there is a match between a crime-scene sample and a DNA profile (a "hit"), NDIS notifies the submitting laboratory, which then forwards the match information to the relevant law enforcement agency. Fingerprints linked to the DNA

profile are used to identify the individual whose DNA profile matched a crime-scene DNA sample.

California conducts "familial searching" using DNA profiles in CODIS. A familial search identifies DNA profiles that are not a precise match to the crime-scene DNA sample, but are a close enough match to suggest that the individual whose DNA profile is in CODIS may be related to an individual who left DNA at the crime scene. Defendants state that, as a matter of policy, California does not now conduct familial searching using DNA profiles in the Arrestee Index (as distinct from the Convict Index). Plaintiffs contend, however, that the State will likely conduct familial searching of the Arrestee Index in the future. This is so, they contend, because a supervisor of the California DNA program has stated that all California DNA profiles are now entered into the Arrestee Index rather than the Convict Index, and that California cannot easily transfer those profiles from the Arrestee Index to the Convict Index after a conviction has been obtained.

The DNA samples and profiles taken from arrestees are retained unless an arrestee successfully applies for expungement. Expungement is a lengthy, uncertain, and expensive process. If no charges are filed, an individual must wait until the relevant felony's statute of limitations has run before applying for expungement. *See* Cal. Penal Code § 299(b)(1). Depending on the felony for which the individual was arrested, the statute of limitations is three years or longer. *See* Cal. Penal Code §§ 799-801. If charges are filed, an arrestee often need not wait until the expiration of the statute of limitations. Expungement may be sought after the charges are dismissed by a trier of fact before adjudication; after a conviction has been reversed and the case dismissed; after the arrestee has been found factually innocent; or after the arrestee has been acquitted of the charged offense. Cal. Penal Code § 299(b)(1)-(4). Arrestees seeking expungement must pay their own expenses and attorney's fees. Unlawfulness of an arrest is not a ground for expungement.

After requesting expungement, an arrestee must wait a minimum of 180 days before a court can act. *See* Cal. Penal Code § 299(c)(2)(D). The court has discretion to grant or deny the request for expungement. The denial of a request for expungement is a nonappealable order and cannot be reviewed by petition for writ. Cal. Penal Code § 299(c)(1). The prosecuting attorney can prevent expungement by making an objection. *See* Cal. Penal Code § 299(c)(2)(D). The State reports that California has expunged more than 900 convicted felon profiles and denied eight requests for expungement. It does not report expungement of any arrestee profiles.

California law provides some protection for individuals who have submitted DNA. DNA samples may be tested only to create the DNA profile. The DNA Act prohibits use of individual samples or profiles for purposes other than law-enforcement-related matching. *See* Cal. Penal Code § 299.5(f)(I). However, California law does permit statistical studies using anonymous DNA profiles. Individuals who misuse DNA profiles in violation of California law are subject to imprisonment for up to a year and a fine of up to $50,000. *See* Cal. Penal Code § 299.5(I). The district court found that there have been no reported instances of misuse.

## II.     *Friedman v. Boucher*

In *Friedman*, we addressed the taking of DNA testing from an arrestee without a warrant and without suspicion of a crime that the DNA might help to solve. Friedman was a pre-trial detainee in the Clark County, Nevada, jail, pending prosecution on criminal charges. *Friedman v. Boucher*, 580 F.3d 847, 851 (9th Cir. 2009). Our opinion does not state whether the charges were felony or misdemeanor. A Las Vegas police officer forcefully took a DNA sample from Friedman at the direction of a county Deputy District Attorney who wanted the DNA for inclusion in the Nevada cold case data bank. *Id.* at 851. Friedman brought a § 1983 damages action against the police officer who took the sample and the district attorney

who asked for it. We held that the defendants had violated Friedman's clearly established Fourth Amendment right to be free from an unreasonable search. *Id.* at 858.

We had previously upheld the compelled taking of DNA samples from convicted felons. *See United States v. Kriesel*, 508 F.3d 941, 942 (9th Cir. 2007); *United States v. Kincade*, 379 F.3d 813, 832 (9th Cir. 2004) (en banc); *Rise v. Oregon*, 59 F.3d 1556, 1562 (9th Cir. 1995). However, we refused to extend these cases to a warrantless, suspicionless, compelled taking of DNA from a pre-trial detainee. *Friedman*, 580 F.3d at 856-58. We wrote that government interests justifying the unconsented taking of DNA from convicted felons in our earlier cases were not present: "The Nevada authorities extracted DNA from Friedman not because they suspected he had committed a crime, nor to aid in his reintegration into society, nor as a matter of his continuing supervision. Their purpose was simply to gather human tissue for a law enforcement databank, an objective that does not cleanse an otherwise unconstitutional search." *Id.* at 858.

The majority gives five reasons why it believes our decision in *Friedman* does not control this case. None of the reasons is sufficient to distinguish *Friedman*.

First, the majority states, "[T]he DNA collection . . . was conducted at the whim of deputy district attorney, acting without any statutory authority. . . . In contrast, the DNA collected in California from the Plaintiffs was approved in a statewide ballot referendum, which is a 'basic instrument of democratic government[.]' " Maj. Op. at 1965. We made clear in *Friedman* that absence of an authorizing statute was not determinative of the appellant's Fourth Amendment claim. We wrote that "adherence to a state statute does not guarantee compliance with the Fourth Amendment." *Id.* at 853 (citing *Virginia v. Moore*, 553 U.S. 164, 171 (2008)). Further, if the action of a state or local official is taken pursuant to an unconstitutional

state law, it does not matter whether that law was enacted by the legislature or approved directly by the voters.

Second, the majority states, "[T]he police in *Friedman* singled out one individual for a search. In contrast, the California DNA Act is programmatic, and applies to all felony arrestees." Maj. Op. at 1965. That a search is of a single person, at the discretion of an individual official, or of a group of people, mandated by a general rule, has never been a touchstone of Fourth Amendment analysis. Our opinion in *Friedman* did not rely on the fact that the search in that case was of a single individual. In rejecting the government's arguments, we noted that "the government's position . . . would endorse *routine*, forcible DNA extraction." 580 F.3d at 857 (emphasis added). We held such routine searches could not be justified by " 'the mere chance that desired evidence might be obtained.' " *Id.* (quoting *Schmerber v. California*, 384 U.S. 757, 769-70 (1966)). In holding the plaintiff's Fourth Amendment right to be clearly established, we wrote that our precedent "precluded the interpretation that the government could forcibly extract DNA from all pre-trial detainees *as a matter of routine*, unrelated to facility security considerations." *Id.* at 859 (emphasis added).

Third, the majority states, "[T]he detective 'forced Friedman's jaw open and forcefully took a buccal swab from the inside of Friedman's mouth.' . . . In contrast, California arrestees typically swipe the buccal swab along their own mouths; thus law enforcement officials do not usually use force." Maj. Op. at 1966. California law expressly permits the use of force (as well as the use of criminal misdemeanor charges) if an arrestee refuses to provide a DNA sample. *See* Cal. Penal Code § 296.1(a). Indeed, Reginald Ento, one of the plaintiffs in this case stated that he was threatened with force when he declined to provide a sample. Our opinion in *Friedman* describes the physical compulsion used to take the DNA, but our holding does not turn on the use of physical force. We held the compelled search unconstitutional because it could

not be justified by a permissible law enforcement objective. *Friedman*, 580 F.3d at 853-858 (rejecting all three of the State's claims that an exception to the warrant requirement applied).

Fourth, the majority states, "[T]he California DNA Act imposes criminal penalties on people who misuse DNA information . . . ; Nevada had no such safeguards because no statute authorized the DNA collection." Maj. Op. at 1966. In *Friedman*, we expressed no concern that the officer might "misuse" the arrestee's DNA sample in the sense of using it for purposes other than placement in the State's cold case database. *Friedman*, 580 F.3d at 858. Rather, we held that the compelled taking of Friedman's DNA and its placement in the database for investigative purposes was, in and of itself, a misuse. Whether a coerced DNA sample would be used, or misused, in other ways is irrelevant under *Friedman*.

Fifth, the majority states, "[T]he California DNA Act is clearly intended to allow law enforcement officials to identify criminal suspects, a purpose that we expressly approved in *Rise* [*v. Oregon*, 59 F.3d 1556, 1560 (9th Cir. 1995)]. . . . It is unclear what purpose the DNA collection in *Friedman* was intended to serve because it was not authorized by any Nevada statute or regulation." Maj. Op. at 1966. The majority is wrong in stating that the purpose of Proposition 69 is to identify the felony arrestees who are compelled to provide DNA samples. Rather, as I discuss below, its sole purpose is to assist in criminal investigations. The majority is also wrong in stating that the purpose of the DNA collection in *Friedman* was unclear. We wrote that "the deputy district attorney wanted to put Friedman's DNA sample in a cold case data bank." *Friedman*, 580 F.3d at 851. We wrote, further, that the deputy district attorney "represented to a Nevada Justice Court that she had ordered the search to use Friedman's DNA in the investigation of cold cases," and that the police officer "wanted the sample as an aid to solve cold cases." *Id.*

Unlike the majority, I conclude that our decision in *Friedman* controls this case. We are bound by *Friedman* unless we go en banc to overturn it.

### III.   Fourth Amendment

Even if *Friedman* were not controlling, I would conclude that Proposition 69 violates the Fourth Amendment.

The majority emphasizes the similarity between fingerprints and DNA. *See, e.g.*, Maj. Op. at 1971-72 ("Given the certain constitutionality of fingerprinting and the clear analogy between fingerprinting and DNA identification under the DNA Act, as amended, privacy concerns here are diminished substantially."). I agree that fingerprints and DNA are similar. Precisely because of that similarity, Proposition 69 is unconstitutional.

Fingerprints and DNA are both valuable law enforcement tools. In *United States v. Kelly*, 55 F.2d 67 (2d Cir. 1932), an early appellate decision upholding fingerprinting, the court held fingerprinting was a permissible tool of identification, as "an extension of methods of identification long used in dealing with persons under arrest for real or supposed violations of the criminal laws." *Id*. at 69. Subsequent court decisions have upheld the use of fingerprints for identification purposes. *See*, *e.g.*, *Napolitano v. United States*, 340 F.2d 313, 314 (1st Cir. 1965) ("Taking of fingerprints [of those released on bail] is universally standard procedure, and no violation of constitutional rights.").

But there are limits on the purpose for which fingerprints may be taken. The Supreme Court has twice held that fingerprints may not be taken unless there is consent, a warrant, or probable cause. In *Davis v. Mississippi*, 394 U.S. 721, 722 (1969), police in Meridian, Mississippi, arrested and took the fingerprints of "at least 24 Negro youths," including Davis, as part of a rape investigation. The police were required to have

probable cause in order to arrest Davis. *See*, *e.g.*, *Draper v. United States*, 358 US. 307, 310 (1959) ("The crucial question . . . is whether [the arresting officer had] 'probable cause' within the meaning of the Fourth Amendment . . . to believe that petitioner had committed or was committing a violation of the narcotic laws." (footnote and internal citations omitted)).

Davis's fingerprints, taken by the police, matched fingerprints found on a windowsill of the victim's home. Based in part on that match, Davis was convicted and sentenced to life in prison. The Court held that the fingerprint evidence should have been suppressed because it had been taken in violation of the Fourth Amendment. The Court noted that the state had conceded that Davis had been arrested without probable cause. *Davis*, 94 U.S. at 723. The Court rejected two reasons argued in support of taking Davis's fingerprints—that the fingerprints had been taken as part of an investigation into a crime and that fingerprints are a particularly reliable kind of evidence. The Court wrote, "[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment." *Id.* at 726. It wrote, further, "[W]e find no merit in the suggestion . . . that fingerprint evidence, because of its trustworthiness, is not subject to the proscriptions of the Fourth and Fourteenth Amendments. Our decisions recognize no exception to the rule that illegally seized evidence is inadmissible at trial, however relevant and trustworthy the seized evidence may be as an item of proof." *Id.* at 723-24.

In *Hayes v. Florida*, 470 U.S. 811, 812 (1985), police in Punta Gorda, Florida, were investigating a series of burglary-rapes. After interviewing over thirty men who generally fit the description of the assailant, "investigators came to consider [Hayes] a principal suspect." *Id.* Police went to Hayes's house. They told him that he could either come to the police station voluntarily to be fingerprinted or that he would be arrested. Police then arrested Hayes and took him to the sta-

tion, where they took his fingerprints. The police were required to have probable cause in order to arrest Hayes.

Hayes's fingerprints matched those left at the scene of one of the crimes. *Id.* at 813. Based in part on the match, Hayes was convicted of burglary and sexual battery. The Court held that *Davis* required suppression of the fingerprints. It wrote that there had been, in fact, no probable cause. It wrote, "Here, as in *Davis*, there was no probable cause to arrest, no consent to the journey to the police station, and no judicial authorization for such a detention for fingerprinting purposes. . . . None of our later cases have undercut the holding in *Davis* that transportation to and investigative detention at the station house without probable cause or judicial authorization together violate the Fourth Amendment." *Id.* at 814-15.

The Court in *Hayes* wrote in dictum that in some circumstances fingerprints could possibly be taken without probable cause. It wrote:

> None of the foregoing implies that a brief deten-tion in the field for the purpose of fingerprinting, where there is only reasonable suspicion not amount-ing to probable cause, is necessarily impermissible under the Fourth Amendment. There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprint-ing, if there is reasonable suspicion that the suspect has committed a criminal act, [and] if there is a rea-sonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime . . . .

*Id.* at 816-7 (internal citations omitted).

Relying on *Davis* and *Hayes*, we have distinguished between fingerprint evidence taken for identification and for investigative purposes. In *United States v. Garcia-Beltran*,

389 F.3d 864, 865 (9th Cir. 2004), the government conceded that arresting officers lacked probable cause for the arrest of the defendant. It nonetheless argued for the use of his fingerprints, on the ground that they had been taken merely as evidence of his identity. We held that fingerprints could be taken for identification purposes, but could not be taken solely for investigative purposes. We remanded to the district court for a determination of the purpose for which the fingerprints had been taken. *Id.* at 86-68. We held the same thing a year later in *United States v. Ortiz-Hernandez*, 427 F.3d 567 (9th Cir. 2005). We wrote, "It is established law under *Hayes* and *Davis* that if fingerprints are taken for investigatory purposes, they must be suppressed in a criminal trial." *Id.* at 576; *see also United States v. Olivares-Rangel*, 458 F.3d 1104, 1115-16 (10th Cir. 2006) ("[I]n determining whether the fingerprint evidence in this case should be suppressed, we must determine the original purpose for arresting and later fingerprinting Defendant; that is, was Defendant fingerprinted merely as part of a routine booking or processing procedure or was the illegal arrest in part for the purpose of obtaining unauthorized fingerprints so Defendant could be connected to additional alleged illegal activity."); *United States v. Guevara-Martinez*, 262 F.3d 751, 755-56 (8th Cir. 2001) (suppressing fingerprints taken for investigatory purposes after an arrest without probable cause).

I would apply to DNA the law that we already apply to fingerprints. Under that law, if DNA is taken from arrestees under Proposition 69 for purposes of identification, that taking is permissible. However, if it is taken solely for purposes of investigation, that taking is a seizure in violation of the Fourth Amendment.

The meaning of "identification," as used in our caselaw, is the conventional meaning of the term. Identification is a determination of who someone is—his or her name, along with identifying information such as date of birth, address, and the like. In *Garcia-Beltran*, we contrasted investigation,

which was an attempt "to connect [the defendant] to alleged criminal activity," to identification, which was an attempt to determine if he was "really who he says he is." *Garcia-Beltran*, 389 F.3d at 865, 867. Similarly, in *Rise*, we drew a "constitutionally significant distinction between the gathering of fingerprints from free persons to determine their guilt of an unsolved criminal offense and the gathering of fingerprints for identification purposes from persons within the lawful custody of the state." *United States v. Rise*, 59 F.3d 1556, 1560, *overruled on other grounds by City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) and *Ferguson v. City of Charleston*, 532 U.S. 67 (2001).

The majority in this case employs an idiosyncratic, expansive definition of "identification," including investigation within that definition. The majority writes, " 'Identification' encompasses not merely a person's name, but also other crimes to which the individual is linked." Maj. Op. at 1976. "The collection and use of DNA for identification purposes is substantially identical to a law enforcement officer obtaining an arrestee's fingerprints to determine whether he is implicated in another crime." *Id.* at 1976. The majority writes, further,

> Plaintiffs contend that DNA profiling is unnecessary because law enforcement officers already identify arrestees using traditional fingerprinting. However, this argument ignores the significant advantages of DNA profiling over fingerprinting. *Criminals can easily hide their fingerprints by wearing gloves,* but they cannot mask their DNA.

*Id.* (emphasis added). The majority's statement that criminals "can easily hide their fingerprints by wearing gloves" makes clear, if it was not clear already, that it includes investigation in its definition of identification. Under our caselaw's definition of identification, it makes no sense to say that a criminal can hide his identity by wearing gloves. A criminal wears

gloves while he is committing a crime, not while police are identifying him at the police station.

Proposition 69 employs the same idiosyncratic, expansive definition of "identification." California's DNA Act, which includes Proposition 69, provides that the California Department of Justice "shall perform DNA analysis and other forensic identification analysis . . . only for identification purposes." Cal. Penal Code § 295.1(a). Yet it is clear that DNA samples taken under Proposition 69 are used solely for investigative purposes. The text of Proposition 69 makes clear that its objective is solving crime. The phrases "solve crime" or "crime solving" are used five times in the text of the proposition. *See*, *e.g.*, Cal. Prop. 69, § II(d)(1)-(d)(2) (2004) ("Expanding the statewide DNA Database and Data Bank Program is [t]he most reasonable and certain means to accomplish effective crime solving in California" and is "[t]he most reasonable and certain means to solve crime as effectively as other states . . . ."); *id.* at § II(c) ("Law enforcement should be able to use the DNA Database . . . to substantially reduce the number of unsolved crimes [and] to help stop serial crime by quickly comparing DNA profiles of qualifying persons and evidence samples with as many investigations and cases as necessary to solve crime and apprehend perpetrators . . . .").

The ballot argument in favor of Proposition 69, contained in the official voters' pamphlet, focused on the crime-solving potential of DNA. The ballot argument began, "In California, the remains of a boy missing for two decades are finally identified. Two cold murders are solved in Kansas. And in Texas, a serial sexual predator is captured. The cases are cracked thanks to technology police are calling the fingerprints of the 21st century." Ballot Pamp., Gen. Elec. (Nov. 2, 2004), argument in favor of Prop. 69 (emphasis removed) (internal citations and quotations omitted), *available at* http://vote2004.sos.ca.gov/voterguide/propositions/prop69-arguments.htm. The ballot argument continued, stating that taking a DNA sample from an arrestee "is more efficient and

helps police conduct accurate *investigations*. No wasting time chasing false leads[.]" *Id.*; *see also People v. Buza*, 129 Cal. Rptr. 3d 753, 774-75 (Cal. Ct. App. 2011) (listing additional examples).[1]

The protocol for taking DNA samples from arrestees under Proposition 69 also makes clear that the samples are taken from arrestees not for identification, but rather for investigation. As described above, the first step at booking is to take the arrestee's fingerprints, which are then used to identify him. Once police have identified the arrestee, they check to determine whether he has already given a DNA sample. If he has, no additional sample is taken. If he has not, a sample is taken. After analysis of the sample, the arrestee's DNA profile is sent to CODIS. It takes a month, on average, for the DNA analysis to be performed. By that time, the arrestee has long since been identified. Indeed, the arrestee must be identified before his DNA sample can be taken.

Even under the Supreme Court's dictum in *Hayes*, Proposition 69 violates the Fourth Amendment. Under the *Hayes* dictum, DNA may not be taken from an unconsenting arrestee unless there is "reasonable suspicion" that the arrestee has committed a criminal act and there is a "reasonable basis" to believe that the arrestee's DNA will "establish or negate the suspect's connection *with that crime*." *Hayes*, 470 U.S. at 817 (emphasis added). A DNA sample is not taken under Proposition 69 because there is reasonable suspicion that the arrestee has committed a criminal act and that the DNA will help solve "that crime." Rather a DNA sample is taken because a person has been arrested for a felony. The DNA is taken from the arrestee as a matter of course, without the need for any suspicion that he has committed any crime that the DNA will help solve. The DNA is taken because there is a possibility

---

[1]The California Supreme Court has granted California's petition for review in *People v. Buza.* 262 P.3d 854 (Cal. 2011). As a result, the appellate court's opinion has been withdrawn.

that the DNA may help solve some *other* crime—a crime about which the police taking the DNA have no knowledge, indeed a crime that may not even exist.

The majority makes two objections to this analysis. First, the majority writes:

> The dissent's key argument collapses, however, because he completely ignores the fact that the California DNA Act clearly requires that law enforcement officers may only compel DNA collection upon a finding of probable cause that the individual has committed a felony. Moreover, each of the four cases on which the dissent relies for some of his remarkable theories—*Hayes*, *Davis* [ ], *Ortiz-Hernandez* [ ], and *Garcia-Beltran* [ ]— involved the compelled taking of fingerprints without probable cause. This distinction completely undermines our dissenting colleague's novel interpretation of the Fourth Amendment, and his reliance on the four cited cases.

Maj. Op. at 1972-73 (citations and emphasis omitted).

The majority misreads these cases. In all four cases, there had indeed been a determination of probable cause for the arrest. That determination had been made by the police, as a necessary precondition for making the arrests, just as it must be made by the police under Proposition 69. The Supreme Court in *Hayes* and *Davis*, and our court in *Ortiz-Hernandez* and *Garcia-Beltran*, stated that there had not, in fact, been probable cause. But police in all four cases believed there had been probable cause, as a necessary precondition of the arrests.

More important, the issue in all four cases was whether there was probable cause for the crime for which the defendants had been arrested. There is no such probable cause here.

Under Proposition 69, the arrest is made for a felony, but the DNA sample is not taken to investigate that felony. It is taken to investigate another crime *for which there is no probable cause*. It is uncontested that the law enforcement officials who take the samples have no probable cause (or even reasonable suspicion) that the arrestee has committed another crime. Indeed, there may not even be another crime.

Second, the majority writes:

> The other fatal flaw in the dissent's novel construction of the Fourth Amendment is his entirely unsupported assumption that the information derived from compelled fingerprinting and DNA collection may only be used in connection with the crime for which probable cause was found.

Maj. Op. at 1973. I make no such assumption. It is established law that if fingerprints are lawfully taken—for example, for identification purposes—they may be used for later investigative purposes. *Ortiz-Hernandez*, 427 F.3d at 577; *Garcia-Beltran*, 389 F.3d at 868. I assume that this law applies equally to DNA samples. That is, if a DNA sample is lawfully taken, it may be used thereafter for investigative purposes. The problem under Proposition 69 is that the samples are not lawfully taken.

I conclude, based on *Hayes, Davis*, *Ortiz-Hernandez*, and *Garcia-Beltran*, that taking DNA samples from felony arrestees under Proposition 69, without consent, without a warrant, and without suspicion of any crime committed by the arrestee that the DNA will help solve, violates the Fourth Amendment.

### IV.   Totality of the Circumstances

The unconstitutionality of Proposition 69 is clear under *Hayes*, *Davis*, *Ortiz-Hernandez*, and *Garcia-Beltran*. The

totality of the circumstances test applied by the majority is therefore irrelevant. I nonetheless address the majority's application of the test to show that the majority has overstated the strength of the State's interests in taking DNA samples from arrestees and has understated the strength of the plaintiffs' privacy interests.

### A.   Interests of the State

The majority relies on four "key interests" of the State. Maj. Op. at 1975. I take them in turn.

### 1.   Identification of Arrestees

The majority relies on California's interest in the "identification of arrestees," stating that this is the "primary purpose" of Proposition 69. *Id.* As I have just shown, the DNA taken from arrestees under Proposition 69 is not used to identify them. Rather, it is used solely to investigate.

### 2.   Solving Past Crimes

The majority relies on the State's interest in solving crimes, stating that inclusion of arrestees' DNA profiles in the CODIS database "helps solve past crimes." *Id.* at 1978. As noted above, DNA is taken from all felony arrestees almost immediately after their arrest. About one-third of the arrestees are never convicted of the felony for which they are arrested. About two-thirds of them are. The DNA of two-thirds of the felony arrestees would therefore be placed in the CODIS upon conviction even without Proposition 69. The State's interest is thus served by Proposition 69 only to the extent that the DNA of arrestees who are never convicted of a felony is useful in solving crime, and to the extent that the DNA taken from those who are convicted is useful before the date of their conviction.

The majority states that ten months after Proposition 69 took effect "felony arrestee DNA samples had aided Califor-

nia police in 291 database hits." *Id.* The basis for this state-
ment is a declaration of Kenneth Konziak, a Laboratory
Director and Technical Manager/Leader for the State of Cali-
fornia DNA Data Bank Program. Mr. Konziak states that as
of October 31, 2009, "CAL-DNA, used as an investigative
tool, has recorded 10,664 hits . . . . Of these 10,664 hits, so
far 291 have involved arrestee submissions."

However, the "arrestee submissions" to which Mr. Konziak
refers in his declaration are submissions from *all* felony
arrestees, including the submissions from the two-thirds of the
arrestees who will be convicted. Without more, we have no
way of knowing how many of the 291 "hits" were for
arrestees who were later convicted. The hits for later-
convicted arrestees should be excluded from the analysis,
except to the extent that the hits were made because their
DNA samples were analyzed earlier than they otherwise
would have been.

The majority also provides examples of two crimes, com-
mitted by Donald Carter and Rene Hernandez, that have been
solved through the use of DNA in the arrestee database. Maj.
Op. at 1978. These are two of six examples given in the
amicus brief filed in this court by the California District
Attorneys Association. None of these six examples was pro-
vided to the district court. In none of them are we told that the
DNA samples were provided by never-convicted arrestees. In
five of the six examples, the brief states that the criminal
charges were still pending; in the sixth, the brief is silent.
Given the brief's description of the circumstances of the
crimes that were charged in these six cases, it seems probable
that all of the six will be, or by now have been, convicted of
the felonies for which they were arrested.

It is likely that the inclusion of the DNA profiles of never-
convicted California felony arrestees in the CODIS database
under Proposition 69 will help solve some crimes, but based

on the evidence presented to the district court we do not know how likely.

### 3.  Preventing Future Crimes

The district court was presented with evidence purporting to show the effectiveness of Proposition 69 in preventing future crime, but the court gave it "little weight." *Haskell v. Brown*, 677 F. Supp. 2d 1187, 1201 (N.D. 2009). The court wrote, "Though the government might be able to introduce more reliable evidence about the efficacy of arrestee DNA in preventing future crimes, it has not done so convincingly at this stage of the litigation." *Id.*

Despite the district court's statement, the majority writes, "DNA not only solves past crimes, but it helps police prevent crimes from occurring in the future." Maj. Op. at 1979.

### 4.  Exonerating Innocent Suspects

The district court gave little weight to the State's interest in exonerating the innocent served by Proposition 69. It wrote, "At this stage of the litigation, this interest is not very strong. Though convicting the right person can theoretically serve to exonerate (or obviate the risk of investigating and prosecuting) the wrong person, the government has not yet introduced any evidence that the taking of arrestees' DNA has led to either an increase in exonerations or a decrease in false accusations/convictions." 677 F. Supp. 2d at 1201 n.12.

Despite the district court's statement, the majority writes that "the DNA database also allows law enforcement officers to eliminate innocent persons from suspect lists" and, in some cases, to free those who have been wrongly convicted. Maj. Op. at 1979. "There are few greater injustices than the wrongful imprisonment of an innocent person." *Id.* at 1980.

The majority uses the famous Chester Turner case to support its argument that DNA testing of never-convicted

arrestees serves to exonerate the innocent. David Jones was convicted in 1995 for three murders he did not commit. Turner was convicted of rape in 2002 and a DNA sample was then taken. Turner's DNA profile matched DNA collected at two of the three murder scenes, and Jones was released from prison in 2004. If Turner's DNA had been available in 1995, it likely would have prevented Jones's wrongful conviction. But Proposition 69 was not necessary for this purpose. Turner had been convicted of a felony before 1995. If Turner's DNA had been taken when he was convicted of that felony, as it could have been even without Proposition 69's authorization of DNA collection from arrestees, it would have been available to exonerate Jones during the investigation of the murders.

## B.    Plaintiff's Privacy Interests

Our cases upholding mandatory DNA testing have started from the assumption of " 'severely diminished expectations of privacy' " for those who have been convicted of crimes. *See Kriesel*, 508 F.3d at 941 (quoting *Samson*, 547 US. at 882). In those cases, we have found that felony parolees and those on supervised release are " 'not entitled to the full panoply of rights and protections possessed by the general public.' " *Kriesel*, 508 F.3d at 947 (quoting *Kincade*, 379 F.3d at 833).

This case, however, concerns arrestees. All four of the plaintiffs were arrested for felonies, but no plaintiff was convicted of the felonies for which he or she was arrested. Two of them were not even charged.

An arrestee does not have the same privacy interest as a person in the general population. *See Rise*, 59 F.3d at 1559-60 (holding those booking procedures requiring fingerprint identification of arrestees would be unlawful as applied to "free persons"). But we have repeatedly recognized that an arrestee has greater privacy interests than someone who has been convicted. *See*, *e.g.*, *United States v. Scott*, 450 F.3d 863, 873 (9th

Cir. 2006) (holding that a "defendant out on his own recognizance before trial" possessed "privacy . . . interests far greater than a probationer's").

The majority recites "numerous degrading physical and emotional intrusions" to which imprisoned arrestees are subject, Majority Op. at 1967, but it misunderstands the nature of the privacy interests and does not take into account the justifications for impinging on those interests. The invasive search procedures upheld in *Bell v. Wolfish*, 441 U.S. 520, 558 & n.39 (1979) and *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 971-73 (9th Cir. 2010), were justified by the need for "security and order" in jails. *Bell*, 441 U.S. at 561. The same is true of the opposite-sex monitoring of prisoners while in the shower and bathroom upheld by the Seventh Circuit. *Johnson v. Phelan*, 69 F.3d 144, 146 (7th Cir. 1995) (noting the need for such monitoring because "inter-prisoner violence is endemic").

The other intrusions cited by the majority have only been upheld in exigent or specialized situations. For example, the Eleventh Circuit has upheld the restraint and pepper-spray of an arrestee, but in that case, the arrestee "repeatedly placed officers' lives and innocents' lives in danger by engaging the police in a multi-county vehicle chase that did not end until [he] had crashed *twice*." *Garrett v. Athens-Clarke Cnty., Ga.*, 378 F.3d 1274, 1280 (11th Cir. 2004). In *Valdez v. Rosenbaum*, we upheld a four-and-one-half month telephone-access restriction imposed on a pre-trial detainee. 302 F.3d 1039, 1048 (9th Cir. 2002). That restriction was imposed at the request of prosecutors "to prevent Valdez from tipping off his co-conspirators about the recently-issued indictments and, thereby, to ensure their capture with minimal danger to the arresting officers." *Id.* at 1046.

Finally, the majority cites a case described in a newspaper article for the proposition that pretrial detainees can be "in lockdown for as much as 23½ hours a day, always shackled

in chains, even when taking a shower or making a phone call, and rarely being allowed to see daylight and breathe fresh air." Maj. Op. at 1968. The majority misunderstands what happened in that case. The court did not find these conditions constitutional. Instead, the court held that the criminal defendant could not challenge them as a part of his criminal trial. The court denied the defendant's motion "without prejudice to his right to file a separate civil action." Order at 14, *United States v. Morgan*, No. 2:07-cr-00145-KDJ-PAL (D. Nev. Oct. 23, 2008), ECF 399.

The majority's assessment of plaintiffs' privacy interest turns on the analogy between fingerprints and DNA. We once observed that "information derived from the [DNA] sample is substantially the same as that derived from fingerprinting." *Rise*, 59 F.3d at 1559-60. Our sister circuits have made similar observations. *See United States. v. Mitchell*, 652 F.3d 387, 410 (3rd. Cir. 2011) (en banc) ("Given the record in front of us today, we conclude that a DNA profile is used solely as an accurate, unique, identifying marker—in other words, as fingerprints for the twenty-first century."); *Boroian v. Mueller*, 616 F.3d 60, 67 (1st Cir. 2010) ("Given the DNA Act's stringent limitations on the creation and use of DNA profiles, CODIS currently functions much like a traditional fingerprint database, permitting law enforcement to match one identification record against others contained in the database."); *Banks v. United States*, 490 F.3d 1178, 1192 (10th Cir. 2007) ("These restrictions allow the Government to use an offender's DNA profile in substantially the same way that the Government uses fingerprint and photographic evidence—to identify offenders, to solve past and future crimes, and to combat recidivism.").

But our more recent decisions have explicitly recognized that DNA testing constitutes a greater infringement on privacy than fingerprinting. In *Kriesel*, we noted that "concerns about DNA samples being used beyond identification purposes are real and legitimate." 508 F.3d at 947-48. In *Kincade*, a major-

ity of the en banc court found that DNA testing represents a significantly greater infringement on privacy than fingerprinting. Judge Gould, concurring, wrote that "unlike fingerprints, DNA stores and reveals massive amounts of personal, private data about [an] individual." 379 F.3d at 842 n.3. "[U]nlike DNA, a fingerprint says nothing about the person's health, their propensity for particular disease, their race and gender characteristics, and perhaps even their propensity for certain conduct." *Kriesel*, 508 F.3d at 948 (quoting *Kincade*, 379 F.3d at 842 n.3 (Gould, J., concurring)).

The majority stresses the limited subset of genetic information used by law enforcement to establish a DNA profile, so-called "junk DNA." Maj. Op. at 1970. However, "studies have begun to question the notion that junk DNA does not contain useful genetic programming material." *Kincade*, 379 F.3d at 818 n.6 (citation omitted). "[W]ith advances in technology, junk DNA may reveal far more extensive genetic information." *Kriesel*, 508 F.3d at 947.

Even with today's technology, however, junk DNA reveals more information than a fingerprint. Unlike fingerprint patterns, which do not appear to be hereditary, DNA sampling reveals information about familial relationships. Identical twins do not have the same fingerprints, but they do have the same DNA. Siblings, parents, and children, who do not have similar fingerprints, have similar DNAs. Because of this similarity, DNA has been used for "familial searching," in which law enforcement officials look for partial DNA matches between crime scene DNA samples and DNA profiles in CODIS. Defendants claim that California does not currently conduct such familial searches on *arrestee* DNA profiles, but the possibility—even likelihood—that California will begin conducting such searches in the future remains. *But see Mitchell*, 652 F.3d at 409 n.19 (finding privacy concerns based on familial searching "speculative").

## Conclusion

We have never allowed the compulsory taking of DNA samples from mere arrestees. We should not begin now. Proposition 69 does not authorize the taking of DNA samples from felony arrestees for identification purposes. Rather, it authorizes the taking of DNA samples for solely investigative purposes. Such takings are unconstitutional under the Supreme Court's decisions in *Davis* and *Hayes*, and under our decisions in *Ortiz-Hernandez* and *Garcia-Beltran*.

Because the unconstitutionality of Proposition 69 is clear under these cases, the totality of the circumstances test that we have applied in cases involving convicted felons is irrelevant. However, if I were to apply the test, I would find the State interests served by taking DNA samples from felony arrestees who will never be convicted of the felony for which they are arrested, and from arrestees before they are convicted of that felony, much weaker than the majority finds them. I would find the strength of plaintiffs' privacy interests much stronger.

I respectfully dissent.